Markman, J.
Defendant was found guilty but mentally ill of home invasion, felonious assault, and felony-firearm, charges that resulted from an altercation he had with Randy Krell, the man who defendant believed had caused the death of his teenage son, Charlie, in an episode of road rage. Defendant perceived Krell to have been unremorseful about his role in the tragedy and antagonistic towards defendant’s family during subsequent legal proceedings in which Krell was convicted of only a misdemeanor for his involvement in Charlie’s death. The only issue at defendant’s trial was whether he was legally insane at the time of the incident. The prosecutor’s expert witness opined that he was not, while defendant’s expert opined that he was. Although these expert witnesses were the only doctors who testified at defendant’s trial, their opinions regarding defendant’s sanity were not the only expert opinions before the jury. Rather, defendant’s jury was repeatedly told about the diagnosis of a third expert who was conspicuously absent from defendant’s trial — a psychiatrist unaffiliated with either the prosecution or the defense, and the only doctor to have examined defendant within days of the incident, who, in a report that was reviewed by the other experts but never authenticated and offered into evidence, diagnosed defendant as suffering from “[mjajor depression, single episode, severe without psychosis.” We conclude that the use of this power *519 ful, tiebreaking diagnosis as substantive evidence of defendant’s sanity compromised his constitutional right to be confronted with the witnesses against him. Accordingly, we reverse the judgment of the Court of Appeals, vacate defendant’s convictions, and remand for further proceedings.
I. FACTS AND PROCEEDINGS
On June 16, 2006, defendant’s teenage son, Charlie, was killed in an automobile accident. Defendant describes the accident as a road rage incident, in which a car driven by Randy Krell allegedly engaged in a high-speed chase that resulted in the crash of another car in which Charlie was a passenger, killing Charlie and rendering another teenage passenger in the same car a paraplegic. The drivers of both vehicles were charged with vehicular manslaughter. The driver of the car in which Charlie was a passenger pleaded guilty to a lesser offense and apologized to defendant’s family. Krell opted to go to trial, claiming his innocence. He was convicted of negligent homicide, a misdemeanor, and was sentenced to six months in jail and probation. During the proceedings, defendant perceived Krell as insulting and antagonizing to his family. Krell never apologized.
According to his relatives, friends, and colleagues, defendant experienced a significant change in his mood and behavior after Charlie was killed. Defendant saw a psychologist and was prescribed an antidepressant (Prozac) and an antianxiety medication (Xanax). On March 27, 2007, defendant watched his son’s school baseball team play what would have been the first game of Charlie’s varsity season. Witnesses described defendant as depressed and uncommunicative at the time. There were several indications that he was thinking of suicide.
*520 The next day, defendant drove to Krell’s house with a gun. Krell testified that he saw defendant get out of his car with a gun in his hand and that defendant pointed the gun at his chest and said that the two men had to talk. Krell ran across the street to the home of a neighbor, Thomas Williams, who let Krell in. Defendant kicked in the door and told Williams, “I’m not here for you” but for “him.” Krell ran out the back of the house. Someone else called 911. Defendant left in his car and drove to his mother’s home in Toledo, Ohio, where he hid the gun in a register and then left.
The police and defendant’s family and friends looked for defendant after he left Williams’s house. Attorneys who had represented defendant’s family were also involved in the search and were in frequent contact with the Monroe County Prosecutor and the police. Eventually, a family friend found defendant at a gas station, approximately 20 miles away near Toledo, Ohio, and drove him to Flower Hospital in Toledo. Defendant was arrested en route to the hospital. One of the lawyers arranged for defendant’s admission to the hospital and declined to allow the police to interview him because of his condition. Defendant was taken to a crisis center, where he spent the night.
The next day, defendant was admitted to the psychiatric intensive care unit at Flower Hospital. There, he was examined by Dr. Agha Shahid, who prepared a three-page report on defendant’s psychiatric condition on March 30, 2007, two days after the incident. Defendant was prescribed Seroquel, an antipsychotic medication, and remained at Flower Hospital for approximately two weeks.
Defendant claimed to have little recollection of what he did on the day of the incident. He remembered sitting in his car at work in the morning, *521 crying. Witnesses saw defendant curled up in a fetal position in his car, rocking back and forth. The next thing he remembered was a red plastic couch at the crisis center in Toledo. He did not remember going to his mother’s home, he did not remember the first couple days of his hospitalization, and he did not remember being interviewed by Dr. Shahid.
Defendant was charged with first-degree home invasion, MCL 750.110a(2), two counts of felonious assault with a dangerous weapon, MCL 750.82, and felony-firearm, MCL 750.227b. He claimed that he was legally insane at the time of the incident on March 28, 2007. The prosecutor presented the expert testimony of Dr. Jennifer Balay, a psychologist who examined defendant at the Michigan Center for Forensic Psychiatry in May 2007. Dr. Balay said that defendant was mentally ill, but she did not think that he was legally insane at the time of the offense. Specifically, she concluded that defendant “was not psychotic at anytime during this depression.” Defendant presented the expert testimony of Dr. Zubin Mistry, a clinical psychologist who interviewed defendant on September 4, 2007. Dr. Mistry disagreed with Dr. Balay’s assessment. He testified that defendant was legally insane at the time of the offense, concluding that defendant had experienced a “major depressive episode with psychotic features” or a “brief reactive psychosis.”
Both Dr. Mistry and Dr. Balay reviewed Dr. Shahid’s report in making their determinations regarding defendant’s mental state. As the first witness presented by defendant, Dr. Mistry provided the requisite testimony needed for defendant to raise his insanity defense. Dr. Mistry testified that Dr. Shahid’s report was one of many sources he had reviewed in reaching his opinion that defendant was legally insane at the time of the *522 incident.[1] In his direct testimony, he never referenced Dr. Shahid’s diagnosis, never discussed any other doctor’s diagnosis, and testified only as to his own diagnosis.
On cross-examination, the prosecutor’s questioning of Dr. Mistry was largely focused on Dr. Shahid, bringing out details about Dr. Shahid’s professional credentials (“He’s an M.D., psychiatrist, correct?”) and Dr. Shahid’s prior relationship to Dr. Mistry (“Do you know Dr. Shahid?” “You respect his opinion, correct?”). At the end of this cross-examination, the prosecutor squarely placed Dr. Shahid’s diagnosis before the jury:
Q. At the end of that report did you read Dr. Shahid’s diagnosis?
A. Yeah.
Q. You read where it says major depression, single episode,-
A. Yes.
Q. -severe, without psychosis?
*523 A Yes.
Q. But you don’t agree that the Defendant did not have a psychosis, do you?
A. No. My opinion is different as to the diagnosis.
The prosecutor later referred to Dr. Shahid’s report in his examination of his own expert, Dr. Balay, again referring to Dr. Shahid’s diagnosis, and asking if Balay agreed with Dr. Shahid’s diagnosis. She answered yes. He also repeatedly mentioned Dr. Shahid and his diagnosis in closing arguments, telling the jury that “it’s real important to look at what Dr. Shahid had to say, even though he did not testify here before you.”[2] Defense counsel did not object to the questioning of the witnesses on the basis of Dr. Shahid’s report and diagnosis or to the prosecutor’s arguments.
The jury found defendant guilty but mentally ill of the charged offenses. He was sentenced to 45 months to 20 years in prison for the home invasion conviction, 1 to *524 4 years for each of the felonious-assault convictions, and 2 years for the felony-firearm conviction.
Defendant appealed in the Court of Appeals and moved for an evidentiary hearing regarding his claim of ineffective assistance of counsel.[3] The Court of Appeals granted defendant’s motion. Following an evidentiary hearing, the trial court denied defendant’s motion for a new trial. The Court of Appeals affirmed. People v Fackelman, unpublished opinion per curiam of the Court of Appeals, issued August 27, 2009 (Docket No. 284512). The court rejected defendant’s challenges to the use of Dr. Shahid’s report at his trial, concluding that the prosecutor had proceeded properly in his use of the report in all instances except in his direct examination of Dr. Balay and that defendant could not show outcome-determinative prejudice with respect to that error. We granted defendant’s application for leave to appeal. People v Fackelman, 486 Mich 907 (2010).
II. STANDARD OF REVIEW
Whether the admission of Dr. Shahid’s opinion regarding defendant’s mental state violated defendant’s Sixth Amendment right of confrontation is a question of constitutional law that this Court reviews de novo. People v Jackson, 483 Mich 271, 277; 769 NW2d 630 (2009).
III. ANALYSIS
A. RIGHT OF CONFRONTATION
The Confrontation Clause of the United States Constitution provides that “[i]n all criminal prosecutions, the accused shall enjoy the right... to be confronted *525 with the witnesses against him . . . US Const, Am VI. Since its birth as a state, Michigan has also afforded a criminal defendant the right to “be confronted with the witnesses against him,” adopting this language of the federal Confrontation Clause verbatim in every one of our state constitutions. Const 1839, art 1, § 10; Const 1850, art 6, § 28; Const 1908, art 2, § 19; Const 1963, art 1, § 20. These constitutional provisions are underscored by MCL 763.1, which provides a criminal defendant the express right to “meet the witnesses who are produced against him face to face.” These exact words have been codified in Michigan law since 1846. 1846 RS, ch 151, § 1; 1857 CL 5704; 1871 CL 7503; How Stat 9068; 1897 CL 11796; 1915 CL 15623; 1929 CL 17129.
“These constitutional and statutory provisions are not accidental. They were incorporated in the jurisprudence of this country by reason of the universal condemnation of the inquisitorial methods of the star chamber which had been in force in England.” People v Saccoia, 268 Mich 132, 135; 255 NW 738 (1934). Specifically, the right to a face-to-face meeting with one’s accusers described in MCL 763.1 is deeply rooted in the common-law right of confrontation. It can be directly traced back to the paradigmatic violation of this right, The Trial of Sir Walter Raleigh for High Treason, 1603, 2 Cobbett’s Complete Collection of State Trials 1 (T. B. Howell, ed, 1809), in which Sir Walter Raleigh was convicted of treason after being denied the opportunity to confront his alleged accomplice and accuser, Lord Cobham, who had implicated him in a letter that was read to the jury. On trial for his life, Raleigh urged, “If there be but a trial of five marks at Common Law, a witness must be deposed. Good my lords, let my Accuser come face to face, and be deposed.” Id. at 19.
*526 This was the notorious example of unfairness that the Framers had in mind and wished to avoid when they guaranteed every criminal defendant the right to be confronted with the witnesses against him. To John Adams, who later drafted the Massachusetts Confrontation Clause, the contours of this right were quite clear: “Every Examination of Witnesses ought to be in open Court, in Presence of the Parties, Face to Face.” 30 Wright & Graham, Federal Practice & Procedure, Evidence, § 6345, pp 521-522 (quotation marks and citation omitted). The great virtue of confrontation and cross-examination, repeatedly emphasized in founding-era documents, is that these mechanisms advance the pursuit of truth in criminal trials better than any others. See 3 Blackstone, Commentaries on the Laws of England (Jones, ed, 1976), p 373:
This open examination of witnesses viva voce, in the presence of all mankind, is much more conducive to the clearing up of truth, than [a] private and secret examination ... [given that] a witness may frequently depose that in private which he will be ashamed to testify in a public and solemn tribunal.... Besides, the occasional questions of the judge, the jury, and the counsel, propounded to the witnesses on a sudden, will sift out the truth much better than a formal set of interrogatories previously penned and settled; and the confronting of adverse witnesses is also another opportunity of obtaining a clear discovery, which can never be had upon any other method of trial.
See also Hale, The History of the Common Law of England (6th ed, 1820), p 345:
[OJftentimes witnesses will deliver [in private] that, which they will be shamed to testify publicly. ... [M]any times the very MANNER of delivering testimony, will give a probable indication, whether the witness speaks truly or falsely.... [Cross-examination] beats and boults out the *527 truth much better.... [A]nd [is] the best method of searching and sifting out the truth ....
Our country’s Sixth Amendment jurisprudence has never lost sight of the truth-seeking function of the right of confrontation. See, e.g. Mattox v United States, 156 US 237, 242-243; 15 S Ct 337; 39 L Ed 409 (1895);[4] California v Green, 399 US 149, 158; 90 S Ct 1930; 26 L Ed 2d 489 (1970) ;[5] Crawford v Washington, 541 US 36, 61; 124 S Ct 1354; 158 L Ed 2d 177 (2004).[6] This historical understanding underscores that “the con *528 frontation guarantee serves not only symbolic goals. The right to confront and to cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials.” Lee v Illinois, 476 US 530, 540; 106 S Ct 2056; 90 L Ed 2d 514 (1986).
In pursuit of the Clause’s truth-seeking purpose, our criminal jurisprudence is clear, then, that “[a] person accused of a crime has a right, at his trial, to be confronted, face to face, with the witnesses against him.” People v Nutter, 255 Mich 207, 215; 237 NW 384 (1931). We also know that the Confrontation Clause applies only to statements used as substantive evidence. Cf. Tennessee v Street, 471 US 409, 413-414; 105 S Ct 2078; 85 L Ed 2d 425 (1985) (holding that evidence admitted solely for impeachment purposes did not violate the Confrontation Clause); see also People v McPherson, 263 Mich App 124, 133; 687 NW2d 370 (2004). And we understand from the constitution that the right of confrontation is concerned with a specific type of out-of-court statement, i.e., the statements of “witnesses,” those people who bear testimony against a defendant. Crawford, 541 US at 51.
In light of these venerable legal principles, it is clear that defendant was denied his constitutional right of confrontation. Dr. Shahid did not appear at defendant’s trial, and defendant was not afforded “the privilege to confront [him] and cross-examine [him] face to face . . . .” Snyder v Massachusetts, 291 US 97, 106; 54 S Ct 330; 78 L Ed 674 (1934), overruled on other grounds by Malloy v Hogan, 378 US 1; 84 S Ct 1489; 12 L Ed 2d 653 (1964). Defendant was not given a prior opportunity to cross-examine Dr. Shahid, nor was it shown that the doctor was unavailable to testify at trial so that his absence could be excused for purposes of the right of confrontation. See 1 Cooley, Constitutional Limitations *529 (8th ed), p 664, articulating one of the few exceptions to the confrontation rule: “If the witness was sworn . .., and the accused had an opportunity then to cross-examine him, ... it seems allowable to make use of his [testimony] ... if the witness has since deceased, or has left the State, or is insane, or sick and unable to testify . . . .”[7]
Moreover, our review of the record leads inescapably to the conclusion that Dr. Shahid was a true “witness against” defendant. The ultimate issue at trial was not whether defendant had actually engaged in the conduct that led to the criminal charges; instead, it was whether he was legally insane at the time.[8] At trial, the medical term that both testifying experts used as shorthand for describing legal insanity was “psychosis,” which, as the prosecutor’s expert explained to the jury, is “when a person loses touch with reality.” Repeatedly, the jury’s attention was focused on this particular mental state. *530 The experts defined “psychosis,” described the symptoms of a person in a “psychotic state,” debated whether a person “could slip in and out of [psychosis] at various time frames,” offered their opinions regarding the effect of psychosis on memory, and rendered their own diagnoses in terms of whether defendant was experiencing psychosis, with the defense expert, Dr. Mistry, concluding that he was and the prosecution’s expert, Dr. Balay, concluding that he was not. In this context, the prosecutor’s improper introduction and repeated use of Dr. Shahid’s diagnosis that defendant was not, in fact, experiencing psychosis fully rendered the doctor a witness against defendant. “In short, when the State elected to introduce [the statement of a nontestifying scientific expert], [that expert] became a witness [the defendant] had the right to confront.” Bullcoming v New Mexico, 564 US_,_; 131 S Ct 2705, 2716; 180 L Ed 2d 610 (2011).
Our review of the record also makes clear that Dr. Shahid’s diagnosis of “[m]ajor depression, single episode, severe without psychosis” was used as substantive evidence for “the truth of the matter asserted.” MRE 801(c).[9] Its admission for this purpose was barred by the Confrontation Clause. Cf. Street, 471 US at 413-414. The prosecutor went well beyond the scope of the direct examination and placed Dr. Shahid’s diagnosis before the jury in his cross-examination of Dr. Mistry, who, very significantly, had not referred to Shahid’s critical diagnosis in his direct testimony. Then, the prosecutor explicitly used Dr. Shahid’s diagnosis in his examination of both experts and in closing arguments. On each *531 occasion, the obvious use of the diagnosis was as substantive evidence for its truth — that defendant was not experiencing psychosis as a result of the circumstances of his son’s death and his perception of Krell’s conduct. The prosecutor did not use Dr. Shahid’s opinion to impeach his own witness, Dr. Balay, who agreed with Dr. Shahid’s diagnosis. Nor does it make sense to suggest that Dr. Shahid’s opinion impeached Dr. Mistry’s credibility, except insofar as it provided an independent piece of substantive evidence weighing in favor of the competing view of Dr. Balay.[10] Dr. Shahid’s diagnosis of no psychosis could only impeach or support the other experts’ opinions if it was taken as true, something the prosecutor made clear in his closing arguments when he told the jury that “it’s real important to look at what Dr. Shahid had to say, even though he did not testify here before you” and then proceeded to rely on Dr. Shahid’s opinion as a third expert’s vote on defendant’s sanity:
And then I went to the conclusion part and said: Well, Dr. Mistry, why.is it then that Dr. Shahid says here that there’s no psychosis and you say there was a psychosis. And *532 the most he could say was: Well, different people have different opinions. Well, that’s true, different people can have different opinions.
. .. And I submit to you from what you’ve heard from Dr. Mistry, from what you’ve heard from Dr. Balay, and the references you’ve heard to Dr. Shahid’s report, there aren’t any real reasons behind Dr. Mistry’s conclusion that the Defendant was suffering from a psychosis, not any real reason at all.
Finally, we conclude that Dr. Shahid’s diagnosis unquestionably falls within the “core class of ‘testimonial’ statements” that are subject to the Confrontation Clause. Crawford, 541 US at 51. The report memorialized defendant’s medical history and the events that led to his admittance to the hospital, provided the all-important diagnosis, and outlined a plan for treatment.[11] It was Dr. Shahid’s “testimony” regarding defendant’s mental illness, his “ ‘solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” Id., quoting 2 Webster, An American Dictionary of the English Language (1828).
And Dr. Shahid’s report was “ ‘made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]’ ” Id. at 52 (citation omitted); see also Melendez-Diaz v Massachusetts, 557 US 305, 310; 129 S Ct 2527; 174 L Ed 2d 314 (2009) (quoting Crawford and employing this test to ascertain that the statement at issue was testimonial). Specifically, the following indications, taken together, are highly probative in this respect: (1) defendant’s admittance to the hospital was arranged by lawyers, (2) defendant was arrested en route to the hospital, (3) the *533 report noted that the Monroe County Sheriff requested notification before defendant’s discharge, (4) defendant referred to a trial and to a gun in his responses related in the report, and, perhaps most significantly, (5) at its very beginning and ending, in which its overall context is most clearly identified, the report expressly focused on defendant’s alleged crime and the charges pending against him. In the introductory paragraph, Dr. Shahid stated:
47-year-old Caucasian married male was referred by Rescue Crisis Mental Health Services with an emergency application indicating that the patient’s son was killed eight months ago in a traffic accident, and the patient drove to the man’s home with a gun who patient felt was responsible for the death of his son. Patient has severe depression and had suicidal thoughts to overdose. The emergency application also indicated that the Monroe County sheriff wants to be called when the patient is discharged to home.
Then in the very last paragraph, Dr. Shahid again referred to the criminal charges pending against defendant, listing these charges in precise legal language: “Patient also has legal charges against him through the State of Michigan 38th Judicial Circuit, and count one is home invasion, first degree, and count two is assault with a dangerous weapon (felonious assault).” Under these circumstances, an “ ‘objective [psychiatrist would] reasonably [be led] to believe that [his statements] would be available for use at a later trial.’ ” Crawford, 541 US at 52 (citation omitted); Melendez-Diaz, 557 US at 310.[12] Accordingly, in *534 our judgment, the admission in evidence of Dr. Shahid’s diagnosis, an out-of-court, testimonial statement offered for its truth, violated defendant’s constitutional right to be confronted with the witnesses against him.
B. EVIDENTIARY ERRORS
There are other reasons why the use of Dr. Shahid’s report at defendant’s trial was improper. First, MRE 703 provides that “[t]he facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence.” (Emphasis added.) This rule permits “an expert’s opinion only if that opinion is based exclusively on evidence that has been introduced into evidence in some way other than through the expert’s hearsay testimony.” 468 Mich xcv, xcvi (staff comment to the 2003 amendment of MRE 703).
It is undisputed that both Dr. Mistry and Dr. Balay reviewed Dr. Shahid’s report in making their determinations regarding defendant’s mental state. Indeed, Dr. Balay specifically testified that Dr. Shahid’s report constituted a “big part” of her opinion. It is understandable why the testifying doctors would rely heavily on Dr. Shahid’s report, given that he was the only doctor to evaluate defendant shortly after the offense. Thus, the facts and data documented in his report provided distinctive insight into defendant’s state of mind at the time of the offense. Because the facts and data in Dr. Shahid’s report were essential to the testifying experts’ opinions, they were required to have been admitted into evidence under MRE 703.
However, Dr. Shahid’s report contained more than just “facts” and “data”; it also contained the doctor’s *535 all-important diagnosis. Under MRE 703, only the facts and data contained in the report were admissible. As previously discussed, Dr. Shahid’s actual diagnosis, a testimonial statement offered for its truth, was barred by the Confrontation Clause. In addition to this constitutional barrier, the diagnosis itself was inadmissible under MRE 703 because it constituted an “opinion,” and thus did not fall within the ambit of MRE 703, which renders admissible only the “facts or data . . . upon which an expert bases an opinion or inference . . . .” (Emphasis added.)[13] Thus, because the diagnosis was inadmissible, under the United States Constitution, the Michigan Constitution, and MRE 703, the report should have been redacted before it was admitted into evidence, and the jury should have been instructed that the proper and limited purpose of the report was to allow them to consider the facts and data on which the testifying experts based their opinions.[14]
*536 Second, contrary to the prosecutor’s contention, Dr. Shahid’s report, including his diagnosis, was not admissible at defendant’s trial under the business records exception to the hearsay rule, MRE 803(6). As a “report . . . [of] opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge,” Dr. Shahid’s report may well have fallen within the scope of the business records exception, but the rule requires that its elements “all [be] shown by the testimony of the custodian or other qualified witness . . . .” Id. (emphasis added).[15] Thus, a recordkeeper or other qualified witness from Flower *537 Hospital would have had to testify for the report to have been properly admitted. This was not done.
Finally, we note that even if the prosecutor had sought to admit the entire report pursuant to the procedures required by MRE 803(6), any testimonial statements contained in the report offered for their truth would have been inadmissible under the business records exception. See Crawford, 541 US at 61 (“Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment’s protection to the vagaries of the rules of evidence . . . .”). Because, as we have already determined, Dr. Shahid’s diagnosis constituted a testimonial statement offered for its truth, it could not have been admitted under the business records exception to the hearsay rule.
C. PLAIN ERROR
Because defense counsel did not object to the use of Dr. Shahid’s report, we review these constitutional and evidentiary errors for plain error affecting defendant’s substantial rights. People v Carines, 460 Mich 750, 763-764; 597 NW2d 130 (1999).[16] We conclude that defendant is entitled to relief under this standard. The violations of defendant’s right of confrontation and the evidentiary errors were clear and obvious. In addition, *538 defendant can show that the errors resulted in outcome-determinative prejudice. Id. at 763. As discussed previously, the ultimate issue at trial was whether defendant was legally insane at the time of the incident, or, in the parlance used at trial, whether he was experiencing psychosis. In assessing the effect of Dr. Shahid’s diagnosis on the jury’s determination regarding this issue, three facts strike us as significant. First, Dr. Shahid’s diagnosis of no psychosis provided a tiebreaking expert opinion in a trial that is fairly characterized as a battle of two experts. Second, Dr. Shahid was the only expert unaffiliated with either party. Third and most importantly, he was the only doctor to have examined defendant within days of the incident, at a time when defendant may still have been experiencing a psychotic episode. The other experts did not interview defendant until months later, when defendant had been on antipsychotic medication for some time. Thus, both the defense and prosecutor’s experts were necessarily trying to re-create defendant’s mental state at the time of the crime. Dr. Shahid was the only doctor who had personal knowledge concerning this dispositive issue.
In sum, a reasonable juror evaluating the difficult issue of defendant’s mental state at the time of the offense could not have overlooked the significance of Dr. Shahid’s diagnosis, which constituted the tiebreaking, neutral expert opinion of the only doctor who had personal knowledge regarding whether defendant was experiencing symptoms of psychosis near the time of the offense. That defendant was not accorded the opportunity to meet this all-important witness “face to face” and to subject him to cross-examination clearly resulted in prejudice. Even a surface review of this record leaves one with many questions for Dr. Shahid’s empty witness chair. For instance, what precisely were *539 the reasons for his diagnosis? How did he reconcile his diagnosis with certain objective indicators of the severity of defendant’s mental illness documented in the report, such as the fact that Dr. Shahid assigned defendant a Global Assessment of Functioning score of 20 out of 100, which Dr. Mistry opined indicated a “significant level of impairment or likelihood to harm oneself or . .. others”; that defendant was prescribed an antipsychotic medication; that defendant had attempted suicide; that defendant had been admitted to the psychiatric intensive care unit for his safety; and that, although defendant was “denying auditory or visual hallucinations” at the time of the examination, defendant stated that, after his son’s death, “ T was smelling things and I felt things crawling under my skin’ ”? Moreover, did defendant actually make the statements attributable to him in Dr. Shahid’s report, or did Dr. Shahid obtain the statements from another source, such as a police report?[17] As Dr. Mistry stated when the prosecutor asked him this exact question, “That would be a question for Dr. Shahid.” Indeed, all these questions are questions for Dr. Shahid, and they went unanswered because he did not testify at defendant’s trial.
The evidentiary errors that occurred at defendant’s trial compounded the prejudice caused by the violation of his right of confrontation. In contravention of the mandate in MRE 703 that the report be “in evidence,” and in spite of the fact that a juror, whose curiosity was understandably piqued by the frequent references to Dr. Shahid’s report, expressly requested to see the “reports that the attorneys were speaking of and the *540 doctors were speaking [of] too,” the jury was never allowed to examine the report for itself. This error was especially prejudicial to defendant because the prosecutor had imprecisely characterized the contents of Dr. Shahid’s report. Specifically, in closing, the prosecutor discussed the statements attributable to defendant in the report and told the jury that defendant “seemed to remember a lot of things” about his altercation with Krell.[18] In actuality, however, the report consistently documented defendant’s inability to remember all but a few details of the incident.[19] Because the report was not “in evidence” as required by MRE 703, the jury was unable to assess the accuracy of the prosecutor’s statements against the facts and data contained in the report and was more likely to have accepted the prosecutor’s characterizations.
Moreover, because the prosecutor never attempted to satisfy the foundational requirements of the business records exception and to authenticate the report, the jury was not given the most basic information it needed to properly consider this document. That is, it was never established that the report was what the prosecu *541 tor asserted it to be — a report (1) that contained “information transmitted by. . . a person with knowledge [Dr. Shahid],” (2) that was “kept in the course of a regularly conducted business activity,” and (3) that it was “the regular practice of [Flower Hospital] to make . . ..” MRE 803(6).
In summary, Dr. Shahid did not appear at trial, he was not subject to cross-examination, and his report was neither in evidence nor authenticated. We have little difficulty concluding that the principal error here — the violation of defendant’s right of confrontation — was outcome-determinative. Carines, 460 Mich at 763. As discussed, Dr. Shahid was the only doctor to examine defendant within days of the incident and, thus, the only expert with personal knowledge of defendant’s mental state immediately after the offense. In this way, the trials of defendant and Sir Walter Raleigh, though separated by centuries and factually unrecognizable, were fundamentally deficient in the same way: at the public trial at which their guilt or innocence was determined, neither man was confronted “face to face” with the most important witness against him. This constitutional error was compounded by the multiple evidentiary errors that resulted from the haphazard manner in which Dr. Shahid’s report was handled at trial. The effect of these errors gave the prosecutor the best of all possible worlds and defendant the worst of these. The prosecutor was able to employ Dr. Shahid’s diagnosis as substantive evidence that defendant was not experiencing psychosis at the time of the incident, without Dr. Shahid having to explain his diagnosis on cross-examination; able to err in his description of the contents of Dr. Shahid’s report without the report being in evidence; and able to rely on a hearsay report without having to prove its authenticity and accuracy in the manner prescribed by MRE 803(6).
*542 Once a defendant demonstrates outcome-determinative plain error, an appellate court must exercise its discretion in deciding whether to reverse. Carines, 460 Mich at 763. “Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant’s innocence.” Id. (quotation marks and citations omitted). Both of these considerations move us in our discretion to vacate defendant’s convictions. Defendant’s guilt or innocence under the law depends on whether he was legally sane at the time of the offense and thus may be held criminally responsible. It was not only the understandable grief caused by the loss of a child that defined defendant’s mental state at the time of the offense, but also his feelings of being abused both by the man he believed was responsible for his son’s death and by the legal system that treated this man’s actions as a mere misdemeanor. Considering this background, it is imperative that defendant have the opportunity to be confronted with the most powerful witness against him before his guilt or innocence is decided. In this process, defendant was denied an ancient right in our criminal system, one on which our adversarial system is premised. If not redressed, this error would, in our judgment, seriously affect the fairness, integrity, or public reputation of the proceedings.
IV RESPONSE TO DISSENT
It is necessary to respond more fully to the disagreements between this opinion and the dissent, specifically with regard to the dissent’s sua sponte argument that defendant somehow waived his right to confront Dr. Shahid, and with respect to our differing perspectives on the Confrontation Clause.
*543 A. WAIVER
The dissent would hold that “defendant affirmatively waived his right to confront Dr. Shahid because he chose, as a matter of trial strategy, not to call him as a witness.” Post at 574. As the prosecutor understood, but the dissent does not, this argument is indefensible.[20] Waiver has been defined as “the ‘intentional relinquishment or abandonment of a known right.’ ” Carines, 460 Mich at 762 n 7, quoting United States v Olano, 507 US 725, 733; 113 S Ct 1770; 123 L Ed 2d 508 (1993). The dissent does not claim that defendant affirmatively waived his constitutional right when his counsel expressed satisfaction with a court ruling allowing the prosecutor’s use of Dr. Shahid’s diagnosis, because no such ruling was made. Cf. People v Carter, 462 Mich 206, 215; 612 NW2d 144 (2000). Nor does the dissent claim that defendant affirmatively waived his constitutional right because his counsel was aware of the confrontation violation at trial but knowingly stood silent, because it is clear this is not what occurred. Specifically, at the Ginther hearing, counsel expressly testified that he did not object to the prosecutor’s use of Dr. Shahid’s report only because he did not recognize it as a confrontation violation; thus, he could not, and did not, intentionally relinquish a known right. Nor does the dissent claim that defendant affirmatively waived his constitutional right by himself placing Dr. Shahid’s diagnosis in evidence because this also did not take place.
Instead, as noted earlier, the dissent claims that defendant waived his constitutional right to confronta *544 tion because “he chose, as a matter of trial strategy, not to call him as a witness.” Post at 574. Not only is the dissent’s waiver argument incompatible with the traditional understanding of waiver, but it also violates several first-principles of criminal law: (1) insanity is an affirmative defense with respect to which a defendant carries the burden of proof, (2) rules of evidence cannot trump the constitution, and (3) the prosecutor bears the ultimate burden of proof in criminal cases. The dissent misapprehends and misapplies each of these first-principles.
First, “it is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense,” MCL 768.21a(l), and the defendant “has the burden of proving the defense of insanity by a preponderance of the evidence.” MCL 768.21a(3). In accord with this framework, defendant’s expert, Dr. Mistry, testified first on the issue of defendant’s mental state at the time of the offense. In his testimony, Dr. Mistry referenced Dr. Shahid’s report, as well as other reports, but he never mentioned Dr. Shahid’s diagnosis. Thus, the dissent’s insight, on which it bases its waiver argument — that “it was defendant who first raised the issue of his insanity and who first opened the door to questioning about Dr. Shahid’s evaluation” — is considerably less remarkable than the dissent believes it to be, because there is simply no other way in which a defendant in these circumstances could conceivably have raised an insanity defense other than through the testimony of a credible expert witness. Post at 573. No such witness could have neglected altogether to mention the existence of the report of the only person who actually interviewed defendant in the immediate wake of his conduct.
*545 Second, the rules of evidence do not trump the Confrontation Clause. See Crawford, 541 US at 61 (“Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment’s protection to the vagaries of the rules of evidence ....”). Thus, although parts of Dr. Shahid’s report should have been in evidence under MRE 703 because they constituted “the facts or data... upon which an expert bases an opinion,”[21] and although under MRE 106’s ‘rule of completeness’ the whole document may sometimes be admitted,[22] these rules necessarily give way to the requirements of the Confrontation Clause. Though parts of the report may have been admissible under the rules of evidence, the rules of evidence cannot override the Sixth Amendment and cannot be used to admit evidence that would otherwise implicate the Sixth Amendment.[23]
*546 The dissent’s indignation over Dr. Mistry’s “selective” use of the report illustrates its confusion on this point. Post at 573. Without a doubt, Dr. Mistry used the report “selectively.” That is precisely our point. On direct, he testified that he relied on the report, which contained facts and data that formed the basis of his opinion, but he never mentioned Dr. Shahid’s actual diagnosis, an opinion that is neither a “fact” nor “data,” and which did not form the basis of Dr. Mistry’s contrary opinion.[24] Such direct testimony regarding the report was entirely proper. Because this testimony defined the permissible scope of cross-examination and, more fundamentally, because the report contained the testimonial statement of a witness defendant had the right to confront, the prosecutor had to either: (1) proceed narrowly, employing the facts and data in the report on which the experts relied in forming their own opinions, but not Dr. Shahid’s opinion; or (2) call Dr. Shahid to testify as to his opinions.[25] Yet, the prosecutor did neither and instead placed Dr. *547 Shahid’s diagnosis before the jury during his cross-examination of Dr. Mistry; employed this same diagnosis in the examination of his own expert; and repeatedly referred to this same diagnosis in closing arguments, all without calling Dr. Shahid as a witness.[26]
Third, the ultimate burden of proof rests with the prosecutor, and thus the obligation to bring to trial “witnesses against” the accused is the state’s, not the defendant’s.[27] The dissent would turn on its head this principle by holding that “defendant affirmatively waived his right to confront Dr. Shahid because he *548 chose, as a matter of trial strategy, not to call him as a witness.”[28] Post at 574 (emphasis added).
The dissent can only arrive at its conclusion that defendant waived his right to confront Dr. Shahid by transforming first-principles of criminal law and creating a constitutional environment in which: (1) a criminal defendant must choose between raising an affirmative defense and his right of confrontation, (2) the rule of completeness is on par with the Sixth Amendment, and (3) the burden of proof may sometimes shift from the state to the accused to call witnesses against himself.
B. MELENDEZ-DIAZ
Next, we must address the differing perspectives on the Confrontation Clause that exist between this opinion and that of the dissent. These differences are perhaps best understood by comparing the quotation that the dissent appears to believe lends the most support for its analysis — footnote 2 of Melendez-Diaz— *549 with the quotation that we believe lends the most support for ours — the Confrontation Clause itself, which states: “In all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him . . . .” We respectfully believe that our analysis is on far surer constitutional footing than that of the dissent.
First, it is necessary to provide some context to the quotation highlighted by the dissent — “[M]edical reports created for treatment purposes . . . would not be testimonial under our decision today” — which is the dissent’s summarization of footnote 2 of Melendez-Diaz. The question presented in that case was whether affidavits reporting the results of laboratory analyses, admitted at trial to show that a substance seized by police was cocaine, violated the defendant’s right of confrontation. Justice Kennedy in dissent responded that the “Court [was] sweeping] away an accepted rule governing the admission of scientific evidence,” and offered cases in support of this claim in two appendices. Melendez-Diaz, 557 US at 330, 357-363. Footnote 2 of the majority opinion sought to distinguish the cases cited by Justice Kennedy:
Other[] [cases] are simply irrelevant, since they involved- medical reports created for treatment purposes, which would not be testimonial under our decision today. See, e.g., Baber v. State, 775 So. 2d 258, 258-259 (Fla. 2000); State v. Garlick, 313 Md. 209, 223-225, 545 A. 2d 27, 34-35 (1988). [Id. at 312 n 2.]
In comparing the actual footnote with the dissent’s quotation, one discovers two highly relevant omissions. When these omissions are considered, and when this quotation is placed in context, it hardly serves as authority to sustain the dissent’s sweeping proposition.
*550 First, the dissent fails to account for the final phrase of the sentence it finds so all-important — “under our decision today.” Id. Contrary to the suggestion of the dissent, the Supreme Court did not expressly state that a medical report created for treatment purposes is not a testimonial statement within the meaning of the Sixth Amendment’s Confrontation Clause. What Melendez-Diaz actually stated was far narrower and more limited — that the cases collected by Justice Kennedy were “irrelevant” because they involved “medical reports created for treatment purposes,” whereas Melendez-Diaz involved an affidavit made for the purpose of providing testimony at trial. Id. Thus, Melendez-Diaz accurately stated that the medical reports cited by the dissent “would not be testimonial under our decision today” because that decision did not involve a medical report created for treatment purposes. Id. Determining the circumstances under which a medical report created for treatment purposes could be considered testimonial was simply left for another day.[29] That Melendez-Diaz did not hold what the dissent contends it held is supported by the fact that Melendez-Diaz did not in any way involve a medical report created for treatment purposes. Accordingly, the footnote is not only dictum, but it is dictum that in no way supports the dissent’s assertion that “none of the nine justices who served on the Melendez-Diaz Court would have included medical reports created for treatment purposes in the definition of testimonial statements.” Post at 566. This assertion has no basis because the Supreme Court was never *551 presented with this question in Melendez-Diaz, and it has not been presented with this question in any subsequent case.
Second, the dissent omits any reference to the two citations that directly follow its quotation, Baber v State and State v Garlick. Read in the context of these two cases, the footnote communicates a critical distinction that courts have made concerning medical records. This distinction is evidenced by even a cursory review of these two cases. Both Baber and Garlick involved hospital records of results of laboratory tests administered for medical treatment purposes, a blood alcohol test and a drug test, respectively. In each case, although the laboratory technicians did not testify at trial, other witnesses from the hospital did. In Baber, the hospital’s medical records custodian laid a foundation under the business records exception to the hearsay rule, and the head of the hospital’s chemistry department testified. Baber, 775 So 2d at 259. In Garlick, the emergency room physician who treated the defendant and ordered the drug screening testified. Garlick, 313 Md at 212.[30] In these circumstances, Baber and Garlick determined that the defendants’ right of confrontation had not been violated, and by their citations of these cases, both opinions in Melendez-Diaz suggested their agreement with that conclusion.
However, neither Baber nor Garlick applied the “two-part test,” see part IV(C) of this opinion, that the dissent believes Melendez-Diaz adopted to arrive at a per se rule that the admission of a medical report created for treatment purposes can never violate the *552 Confrontation Clause. Indeed, after recognizing the traditional understanding of “the concept of confrontation as a device to advance the search for truth,” Garlick expressly qualified its holding in a passage that is particularly relevant to the instant case:
This is not to say, however, that there have not been some hospital records (or more precisely some entries within those records) that have been objectionable or found to have been inadmissible. For example, in Gregory v. State, 40 Md. App. 297, 325, 391 A.2d 437, 454 (1978), the medical staff conference summary containing the opinions of several psychiatrists was not admissible without their testimony. The court stated:
“The mere fact that a document is part of a hospital record made in the ordinary course of the hospital’s business, and may therefore be admissible under the hearsay rule, does not ipso facto make its admission comply with the confrontation requirement... .
“We have here not the routine record of a person’s birth, or death, or body temperature, not any other similar statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely. We are dealing with the opinions of supposed expert witnesses, who, in this document, are giving testimony not only as to appellant’s mental condition, but, more importantly, as to whether or not he is criminally responsible.” [Garlick, 313 Md at 214, 220-221 (quotation marks and citation omitted).][31]
It is sufficient to observe that we too “are dealing with the opinions of a supposed expert witness [], who, in this document, [was] giving testimony not only as to appellant’s mental condition, but, more importantly, as to whether or not he [was] criminally responsible.” Id. at 221.
*553 Other courts have also recognized that not all hospital records can be treated in the same manner for purposes of the confrontation requirement and that psychiatric opinions, in particular, deserve special consideration. See, e.g., Phillips v Neil, 452 F2d 337, 347 (CA 6, 1971) (holding that admission of psychiatric hospital records opining on the sanity of the defendant violated the Confrontation Clause and noting the “danger which inheres in the introduction of records containing psychiatric diagnoses”).[32] Having never addressed this issue, the Supreme Court has never *554 expressly adopted this approach to the admission of medical records for purposes of confrontation, but it certainly has never rejected it, and, as observed, several cases cited approvingly in Melendez-Diaz recognize this distinction.[33] Thus, contrary to the dissent, footnote 2 does not set forth a per se rule regarding the admissibility of medical records under the Confrontation Clause. If anything, such footnote suggests an altogether different legal standard when it is viewed in context and, in particular, when it is understood in light of the two cases which the Court in Melendez-Diaz selected from among the some 80 cases in Justice Kennedy’s appendixes as the prime examples of medical reports that would not be testimonial within the meaning of the Sixth Amendment under its decision.
C. DISSENT’S TEST
It is also important to comment on the dissent’s test for determining whether an extrajudicial statement is testimonial. The dissent recognizes that the Supreme Court in Crawford “did not delineate the scope of testimonial statements” and that Crawford articulated several formulations of this concept. Post at 577. Nonetheless, the dissent proceeds to articulate its own test:
In reviewing Crawford and its progeny, it becomes clear that the Court considers two related factors above all others when deciding whether an extrajudicial statement is testimonial, and therefore within the parameters of the Confrontation Clause: the formality of the statement within a criminal investigation or prosecution and the purpose of the statement. [Post at 577-578.]
*555 While the dissent’s test, in our judgment, constitutes a not-unreasonable attempt to synthesize several very-difficult-to-synthesize Confrontation Clause decisions of the Supreme Court, the test must be recognized for what it is — an attempt to accord meaning to some very tortuous jurisprudence. The absence of any citation for the dissent’s test underscores this reality. The dissent does not cite any Supreme Court decision in support of its “two-part test,” because no such decision exists.
The Court’s recent decision in Bullcoming does not alter this fact. In Bullcoming, 564 US at_; 131 S Ct at 2710, 2713, the Court affirmed the central holding of Melendez-Diaz — that the right to confrontation applies to analysts who claim to have certified evidence from a machine or other objective scientific test- — and rejected the argument that the testimony of a “surrogate” expert was a constitutionally permissible substitute for the testimony of the individual who had actually conducted the test. Questions regarding the Court’s confrontation clause jurisprudence persist after Bullcoming. See id. at _; 131 S Ct at 2725 (Kennedy, J., dissenting) (“Today’s majority is not committed in equal shares to a common set of principles in applying the holding of Crawford”). However, at the very least, Bullcoming clearly reconfirmed that the Confrontation Clause bars the admission of a scientific report, prepared in connection with a criminal investigation or prosecution absent the testimony of the expert himself, regardless of the report’s facial reliability and “even if [the scientists] possess the scientific acumen of Mme. Curie and the veracity of Mother Teresa.” Id. at ; 131 S Ct at 2715 (majority opinion) (quotation marks and citation omitted.) In our judgment, Dr. Shahid’s psychiatric opinions, which are necessarily grounded in subjective interpretations of the vagaries of the human mind, are at least as deserving of the constitution’s *556 guaranteed protections of confrontation and cross-examination as the analyst’s certification of a blood alcohol analysis in Bullcoming. See supra at 552-554.[34]
To be clear, we agree with the dissent that “some meaning can — and must — be given to [the Supreme Court’s confrontation] decisions.” Post at 578 n 40. We too have parsed these cases to discern principles, and have come to what is, in our judgment, a reading that more accurately synthesizes the various holdings and that also adheres more closely to the actual language of the Confrontation Clause. The dissent disagrees. Specifically, it faults this opinion for “substitut[ing] an inquiry into the mere foreseeability of a statement’s use at trial for an inquiry into the primary purpose for which the statement was created[, which] is simply contrary to the mandates of Davis, Melendez-Diaz, and most recently Michigan v Bryant." Post at 582. However, what the dissent disparages as “an inquiry into the mere foreseeability of a statement’s use at trial,” post at 582 is what Crawford expressly offered as one of three “formulations of [the] core class of ‘testimonial’ statements” — statements that were made “under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]” Crawford, 541 US at 51-52. Melendez-Diaz, 557 US at 310, reiterated and applied this exact language to determine that the statement at issue in that case was *557 testimonial. And no subsequent case has renounced this definition of a core testimonial statement.[35]
In place of such explicit direction, the dissent contends that it has been able to divine from Supreme Court decisions an alternative, exclusive test to determine whether a statement is testimonial — “an inquiry into the primary purpose for which the statement was created.” Post at 582. According to the dissent, this test is mandated by a proper application of Davis, Melendez-Diaz, and Bryant. See post at 582. Our reading of these cases is very different. As explained earlier, Melendez-Diaz definitely mandated no such thing. The words “primary purpose” are found nowhere in the opinion, and that opinion expressly reiterated and relied on Crawford’s formulation of “testimonial.”[36] And while *558 Davis and Bryant both employed a primary purpose inquiry to determine whether statements made to the police in the very specific context of an ongoing emergency were testimonial, those cases did not mandate that this was the exclusive test to be applied generally in Confrontation Clause cases. In fact, for the following reasons, we read Davis and Bryant as endorsing a quite different approach.
The primary purpose test was specifically crafted in Davis for the purpose of determining whether statements made in an ongoing-emergency context violated a defendant’s right of confrontation. Davis, 547 US at 822. The test is relevant in that context, because generally the declarant is speaking to authorities either to obtain assistance in what is an ongoing emergency or “to establish or prove past events potentially relevant to later criminal prosecution.” Id. Thus, the test is critical in the ongoing-emergency context because proper characterization of such statements will always prove decisive as to whether these statements are testimonial or not.
Apart from the fact that the “primary purpose” test has never been applied beyond the ongoing-emergency context, the specific “primary purpose” test articulated by the dissent is considerably different from the actual “primary purpose” test applied in Davis, 547 US at 822, which was as follows:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the *559 primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
This test obviously makes sense in the context for which it was specifically designed, emergency circumstances in which there is often ambiguity concerning the objectives or purposes of the declarant’s utterances. However, outside that context, in more ordinary circumstances, the questions posed by the test are largely irrelevant, and the either/or characterization inherent in the limited context of the test is absent.[37] It is utterly unclear how a court would apply the “primary purpose” test outside the Davis context to a case in which no emergency is alleged — what alternative “purposes” would be considered, and how would the resolution of which of these is “primary” bear in any meaningful way on the principles inherent in the Confrontation Clause?[38] A “primary purpose” test removed from its moorings would have little in common with the “primary purpose” test of Davis except for its nomenclature.
We find support for our decision not to extend the “primary purpose” test beyond the ongoing-emergency *560 context for which it was created and apply it as the exclusive, controlling test in this new context in the very Supreme Court caselaw that the dissent claims “mandates” that we apply its test. In fact, one principle clearly emerging from Davis and Bryant is that the circumstances and context in which the statement was made are highly relevant, if not determinative, in deciding whether its admission offends the Confrontation Clause. See Davis, 547 US at 822, 827-830 (repeatedly emphasizing that statements are “testimonial when the circumstances objectively indicate that there is no such ongoing emergency”) (emphasis added); Bryant, 562 US at_; 131 S Ct at 1156 (explaining how a “new context” and circumstances “confront[ed] for the first time” affected its ruling). Indeed, the one thing that does seem clear from recent Confrontation Clause decisions is that the Supreme Court has very explicitly not adopted a bright-line test for determining whether a statement is testimonial, and instead has developed its jurisprudence on a case-by-case basis. See, e.g., Crawford, 541 US at 68 (“We leave for another day any effort to spell out a comprehensive definition of ‘testimonial.’ ”); Davis, 547 US at 823 n 2 (“[O]ur holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are ‘testimonial.’ ”); id. at 830 n 5 (“We have acknowledged that our holding is not an ‘exhaustive classification of all conceivable statements — or even all conceivable statements in response to police interrogation,’ but rather a resolution of the cases before us ....”) (citation omitted); Bryant, 562 US at_; 131 S Ct at 1158 (stating that whether a statement is testimonial requires a “highly context-dependent inquiry”).[39]
*561 For these reasons, we find little merit in the dissent’s contention that Davis, Melendez-Diaz, and Bryant mandate that we exclusively rely on a primary purpose inquiry to determine whether use of Dr. Shahid’s diagnosis, absent his testimony, implicated defendant’s right of confrontation.[40] In examining recent Supreme Court cases on which the dissent rests its decision, it is apparent that the dissent’s reading of these cases is hardly mandated. No Supreme Court decision has articulated the dissent’s allegedly controlling “two-part test,” and there is much language in each of the decisions relied on by the dissent to suggest that it is a test made out of whole cloth.
D. CONFRONTATION CLAUSE
We are not unsympathetic to the dissent’s inability to fashion a single all-purpose Confrontation Clause test from recent Supreme Court decisions. These decisions seem not entirely consistent, they employ varying constitutional tests and formulations for discerning Confrontation Clause violations, they are lengthy and susceptible to having their language taken out of context, *562 and the justices are sharply divided in these decisions, making it sometimes difficult to know which propositions of constitutional law have garnered the support of a majority of the Court.
Nonetheless, we believe that the dissent has erred in its deconstruction of a clause taken from a footnote in a sharply divided opinion of the Supreme Court and that, as a result, it has also erred in fashioning its own “exclusive” test synthesized from Supreme Court decisions, none of which has actually articulated that test and each of which has articulated language incompatible with that test. However difficult an exercise, this majority has also sought to abide by the direction of the Supreme Court and reached a very different result than the dissent.
We believe, though, that our analysis would be incomplete if we did not respond to the dissent’s “two-part test” with an alternative analysis of our own. This analysis is drawn from the actual language of the Sixth Amendment of the United States Constitution. As the “supreme Law of the Land,” US Const, art VI, cl 2, it seems appropriate to consult the actual language of the Constitution when Supreme Court caselaw is not altogether clear.
The Confrontation Clause of the Sixth Amendment of the United States Constitution reads, “In all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him . ...” By its straightforward terms, the Confrontation Clause directs inquiry into two questions: (1) Does the person in controversy comprise a “witness against” the accused under the Confrontation Clause; and (2) if so, has the accused been afforded an opportunity to “confront” that witness under the Confrontation Clause?
*563 First, for the reasons set forth in part 111(A) of this opinion, we believe the accused here has satisfied the first inquiry by demonstrating that Dr. Shahid constituted a “witness against” him. Indeed, we believe that Dr. Shahid was, by far, the most important “witness against” him. Dr. Shahid’s diagnosis that defendant was not experiencing psychosis was employed by the prosecutor as substantive evidence that defendant was not, in fact, experiencing psychosis — a psychosis, incidentally, that any member of the jury could probably have easily understood as having arisen as a function of a parent perceiving that a criminal perpetrator who had caused the needless death of his teenage child was unremorseful and unrepentant about the occurrence and that the legal system was satisfied to punish this perpetrator with a six-month misdemeanor. Dr. Shahid’s report went to the heart of the ultimate issue at trial, upon which defendant’s guilt or innocence under the law entirely turned, and it was relied on by every other significant expert witness testifying on behalf of the prosecution.
Second, for the reasons set forth in part 111(A) of this opinion, we believe the accused here has satisfied the second inquiry by demonstrating that he had no opportunity to confront Dr. Shahid. The accused was never afforded the opportunity to cross-examine Dr. Shahid, therefore ensuring that the accused would be unable to question Dr. Shahid; that the accused would be unable to require that Dr. Shahid look him in the eye in open court, face-to-face, in the presence of the judge and jury and respond to questions; and that the judge and jury would never be required to assess the demeanor, the assuredness, the expertise, and the credibility of Dr. Shahid.[41]
*564 The use of Dr. Shahid’s report against defendant absent any opportunity for cross-examination is exactly what the words of the Confrontation Clause prohibit — however finely the dissent chooses to parse footnote 2 of Melendez-Diaz. By guaranteeing that “the accused shall enjoy the right... to be confronted with the witnesses against him,” the Framers of the Confrontation Clause sought to guarantee that what happened at defendant’s trial would not happen within our criminal justice system.
V CONCLUSION
Because we believe that defendant has been deprived of his right of confrontation under the Sixth Amendment, and because we believe he has suffered considerable prejudice as a result, we reverse the judgment of the Court of Appeals, vacate defendant’s convictions, and remand this case to the trial court for further proceedings.
Cavanagh, Marilyn Kelly, Hathaway (except for footnote 15 and part IV), and Mary Beth Kelly, JJ., concurred with Markman, J.

 Dr. Mistry explained:
You’ll typically interview the individual, extensively observing their behaviors, their mannerisms, their patterns of behavior. You’ll talk to individuals involved as witnesses and oftentimes you will talk to spouses, et cetera, people familiar with their functioning and their level of functioning. You’ll do an assessment of their pre-morbid functioning, which is the way that they responded and functioned in a time frame .. . prior to the event you’re dealing with.... You’ll review medical records from individuals who have been treating, practioners, hospital records. You’ll also review any prior records of. .. mental conditions. You’ll take some family history as to mental conditions. And you do a broad range of assessment of the individual... .
I reviewed records from Flower Hospital, Dr. Shahid’s records, Dr. Indurti had provided some records.... [And] at least a couple of other counselors.

 In addition, the prosecutor also referred to Dr. Shahid in the following excerpts from his closing arguments:
Dr. Shahid is the one at Flower Hospital who talked to [defendant] the day after this happened .... And.. . Dr. Shahid wrote a report that became a very important part of what Dr. Balay later did as far as her report is concerned. ...
Dr. Shahid was told a lot of things about what happened ... by [defendant].... And Dr. Shahid reached the conclusion at the end [of] his examination that [defendant] was depressed, he had severe depression, hut that there was no psychosis involved. . ..
And I submit to you from what you’ve heard from Dr. Mistry, from what you’ve heard from Dr. Balay, and the references you’ve heard to Dr. Shahid’s report....

 People v Ginther, 390 Mich 436; 212 NW2d 922 (1973).

 In Mattox, 156 US at 242-243, the United States Supreme Court explained that
[t]he primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which gives his testimony whether he is worthy of belief.

 Green, 399 US at 158, listed several specific ways in which confrontation advances the truth:
(1) [It] insures that the witness will give his statements under oath — thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the “greatest legal engine ever invented for the discovery of truth”; (3) permits the jury that is to decide the defendant’s fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility. [Citation omitted.]

 Crawford, 541 US at 61, emphasized that
[t]o be sure, the Clause’s ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

 The fact that defendant had the power to subpoena Dr. Shahid and call him as a witness is immaterial to this analysis. This Court long ago rejected this argument. People v Perrin, 223 Mich 132, 135-136; 193 NW 888 (1923). The United States Supreme Court has likewise consistently rejected this argument. See, e.g., Melendez-Diaz v Massachusetts, 557 US 305, 324; 129 S Ct 2527; 174 L Ed 2d 314 (2009) (“[T]he Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court.”) (emphasis added); Briscoe v Virginia, 559 US_; 130 S Ct 1316; 175 L Ed 2d 966 (2010) (vacating the judgment of the Virginia Supreme Court, which held that a defendant’s failure to timely notify the commonwealth of his desire to confront a forensic analyst at trial constituted a waiver of that right); Bullcoming v New Mexico, 564 US_,_; 131 S Ct 2705, 2718; 180 L Ed 2d 610 (2011) (“The prosecution ... bears the burden of proof. Hence, the obligation to propel retesting when the original analyst is unavailable is the State’s, not the defendant’s.”) (citation omitted).

 “An individual is legally insane if, as a result of mental illness . . ., that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law.” MCL 768.21a(1).

 As “a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted,” Dr. Shahid’s report, including his diagnosis, clearly constituted hearsay. MRE 801(c).

 Any other view would make the protections of the Confrontation Clause illusory. Indeed, the prosecutor would not even have to produce his own expert if he could place before the jury absent medical experts’ testimonial diagnoses through the examination of testifying experts. “The Court [has] made clear ... that it will not permit the testimonial statement of one witness to enter into evidence through the in-court testimony of a second[.]” Melendez-Diaz, 557 US at 334 (Kennedy, J., dissenting). Moreover, we would not require juries to engage in the mental gymnastics necessary to conclude that Dr. Shahid’s opinion was not meant to be taken as “true,” but only to “impeach” a contrary opinion. How can an opinion, if not actually true, effectively impeach a contrary opinion? Just as Dr. Mistry’s diagnosis was being used as substantive evidence that defendant was insane, Dr. Shahid’s diagnosis was being used as substantive evidence that he was not. As Dr. Mistry himself noted, the only difference between their opinions was that they were “different as to the diagnosis.”

 The report is on hospital letterhead, is headed “Psychiatric Evaluation,” and is signed and dated by Dr. Shahid.

 We do not overlook other post-Crawford cases in which the United States Supreme Court has further developed the meaning of “testimonial statements” within its Confrontation Clause jurisprudence. Rather, we find that these cases are inapposite. See Davis v Washington, 547 US 813; 126 S Ct 2266; 165 L Ed 2d 224 (2006) (concerning statements made in *534 an ongoing domestic-violence emergency); Michigan v Bryant, 562 US _; 131 S Ct 1143; 179 L Ed 2d 93 (2011) (concerning statements made in an ongoing non-domestic-violence emergency).

 Dr. Shahid, who did not appear at trial and thus was never qualified as an expert, could not, of course, have provided “opinion” testimony. See MRE 702 (requiring that a witness must be qualified as an expert before he or she may “testify ... in the form of an opinion”). Although the jury heard much praise of Dr. Shahid — including that he is the “senior psychiatrist... on staff at Flower [Hospital],” has an “M.D.,” and “is a fantastic doctor” — he was never subjected to voir dire and was not qualified as an expert under MRE 702.

 The jury was given the following instruction:
Experts are allowed to give their opinions in court about matters which they are experts on. However, you do not have to believe an expert’s opinion. Instead, you should decide whether you believe it and how important you think it is. When you decide whether you believe an expert’s opinion, think carefully about the reasons and facts that he or she gave for his or her opinion and whether those facts are true.
Although this instruction was proper, because the jury never actually received Dr. Shahid’s report as required by MRE 703, the jury was unable to fulfill the court’s charge.

 Under the dissent’s application of the business records exception, the requirement that the record must be authenticated would essentially be stricken from the rule. The dissent concludes that “defendant cannot receive relief on the basis of authentication error.” Post at 597. We disagree. There can be no doubt that had the prosecutor moved to admit Dr. Shahid’s report under the business records exception, and had defendant objected because no “custodian or other qualified witness” was present to testify to the elements of MRE 803(6), the report could not have been admitted. See Moncrief v Detroit, 398 Mich 181, 189; 247 NW2d 783 (1976) (explaining the “first principle” that “the proponent of the [hearsay] evidence must lay a foundation which establishes an exception to the hearsay rule”).
Even more importantly, we do not accept the dissent’s conclusion that the lack of authentication was harmless. Had the prosecutor sought to admit the report as a business record (which he did not), and had the court required the prosecutor to comply with MRE 803(6) (which under the rule, it must), then a “custodian or other qualified witness” from Flower Hospital would have been present at defendant’s trial. Far and away, the witness from Flower Hospital most qualified to authenticate the report would have been Dr. Shahid himself, and, at least in our judgment, defendant suffered serious prejudice because of his absence at trial. See part III(C) of this opinion. However, even if the authenticating witness was merely a hospital recordkeeper, the dissent fails to appreciate that this witness still might well have provided meaningful information to the jury. For instance, this witness could have answered some basic questions that were never properly answered at defendant’s trial, such as: Who is Dr. Shahid? Is his report the kind of record that is kept in the regular course of business at Flower Hospital? Do doctors in making such *537 reports often refer to a patient’s pending criminal charges? And do doctors typically review other materials, such as police reports, when they create their reports?

 We believe that defendant is entitled to relief under either the plain error standard articulated in Carines, or the ineffective assistance of counsel standard set forth in Strickland v Washington, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). We proceed under the former only because it requires the higher showing, which, in our judgment, defendant has made.

 The possibility that Dr. Shahid was relying on a police report when he prepared his report is supported by the report’s final sentence, which lists the charges pending against defendant in precise legal detail as a police report would.

 More folly, the prosecutor said:
On March 29th of 2007, Dr. Shahid was told a lot of things about what happened on March 28th, the day before, by Mr. Fackelman. He seemed to remember a lot of things. He remembered going to the place where Randy Krell lived. He remembered seeing Randy Krell and threatening him with a gun. He remembered going in the house, breaking the door down. He remembered seeing the person that [he] encountered once he was in that house. In other words, he remembered just about everything when he talked to Dr. Shahid the next day.

 What Dr. Shahid’s report, in fact, says is: “Patient states, ‘I do not remember driving to Michigan and driving to his house. I do not remember what happened, and the only thing I remember is that I saw a terrified look on that mem’s face and at that time I felt I just woke up and started apologizing to [Williams].’ ”

 The prosecutor himself never argued that defendant waived his confrontation right, with no mention of waiver either in his brief or at oral argument. Rather, he properly considered the issue forfeited and fully addressed the merits of the confrontation issue.

 See supra at 534. The dissent concludes that MRE 703 required defendant to admit Dr. Shahid’s report into evidence. However, the rule is silent as to which party must ensure that “[t]he facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence.” Both parties’ experts relied on the report.

 MRE 106 provides:
When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.
Thus, in making what is clearly a discretionary decision, the trial court would have had to assess the “fairness” of admitting the entire report in this case in light, inter alia, of the fact that defendant’s expert had not testified in any way as to the substance of the report and in view of the fact that there might be constitutional implications to requiring defendant to introduce an expert’s report adverse to his affirmative defense. The dissent misinterprets MRE 106 by asserting that this discretionary rule “would have required” that the entire psychiatric evaluation be introduced into evidence in these circumstances. Post at 595 n 80.

 To be clear, we believe that Dr. Shahid’s diagnosis was inadmissible under MRE 703 and MRE 106, irrespective of the Confrontation Clause. See supra at 534-535 and n 22.

 The dissent fails to recognize that Dr. Shahid’s report is comprised of many statements, only one of which concerns Dr Shahid’s diagnosis, and that it was the prosecutor’s introduction of this statement which violated defendant’s right of confrontation. The dissent’s determination not to differentiate among statements within the report and consider each on its own merits strains its analysis from the start. The out-of-court statement on which the proper confrontation analysis is focused is Dr. Shahid’s diagnosis, and defendant never used that statement, selectively or otherwise.

 The dissent misunderstands this opinion in suggesting that “the majority believes that no impeachment of the defense expert could have occurred under these circumstances unless the prosecutor called Dr Shahid as it own witness,” and in asserting that we “hamstring the impeachment of an expert witness .. . .” Post at 601-602. To the contrary, what this opinion concludes is that the statement at issue — Dr. Shahid’s diagnosis — was clearly not being used for impeachment. We also note that the prosecutor had many avenues of proper impeachment, including the utilization of the facts and data contained in Dr. Shahid’s report relied on by the defense expert.

 We reiterate our view that the prosecutor’s use of Dr. Shahid’s diagnosis on each of these occasions was clearly for the truth of the matter asserted. See supra at 530-532. The dissent disagrees, and goes to lengths to explain how the report was used for impeachment purposes. See post at 589-594. The problems with the dissent’s analysis are threefold. First, it is not focused on the diagnosis as implicating the Confrontation Clause, hut rather lumps together the entirety of the report. Second, the dissent never even attempts to explain how a diagnosis such as Dr. Shahid’s could impeach another expert’s opinion if it is not taken as true. Finally, the dissent again never even attempts to explain how the prosecutor could have used this diagnosis to impeach his own expert, who agreed with it. Like the Court of Appeals, we think it is evident that during the prosecutor’s direct examination of Dr. Balay, he used the remarks from Dr. Shahid’s report as substantive evidence “to prove the truth of the matter asserted .. . .” Fackelman, unpub op at 6. We do, however, agree with the dissent’s impeachment discussion in one respect: we too conclude that the prosecutor’s repeated reference to Dr. Shahid’s report and diagnosis during his closing argument, including his statement urging that “it’s real important to look at what Dr. Shahid had to say, even though he didn’t testify here before you,” was for the truth of the matter asserted. Unlike the dissent, though, we find these arguments prejudicial and entirely indicative of how the prosecutor employed the report and diagnosis throughout trial.

 Because defendant bore the burden on the affirmative defense of insanity, he had to initiate the presentation of evidence that he was legally insane at the time of the offense. He was not required, however, to bring to trial “witnesses against” himself, a burden which rested with the prosecutor.

 As for the dissent’s discussion of trial strategy, it suffices to say that it asks an irrelevant question of the wrong party. In this discussion, the dissent explores the reasons why defense counsel may have chosen not to call Dr. Shahid, and contends that this decision is entitled to deference under Strickland. We do not disagree with this; we just believe that the reasons for counsel’s decision are irrelevant because defendant can be under no obligation to call “witnesses against” himself. The question— “Why didn’t you call Dr. Shahid as a witness?” — would be better directed toward the prosecutor, who is under such obligation. But even though one may be curious about the prosecutor’s answer to this question— especially because Dr. Shahid worked at a hospital only 30 minutes away — his answer is also irrelevant. The only thing relevant is that the prosecutor did not call Dr. Shahid to testify at trial and made no showing regarding his unavailability, as he was required to do under the Confrontation Clause. In sum, counsel’s strategic decision concerning which witnesses to call had no bearing on the clause. Rather, what implicated the clause was the prosecutor’s substantive use of Dr. Shahid’s diagnosis without calling him to testify.

 We emphasize that we do not disagree that Dr. Shahid’s report is a medical report created for treatment purposes. However, it is also a particular kind of medical report — one involving a psychiatric opinion, and one prepared for a legal as well as a treatment purpose — both factors being relevant in assessing the implications of the report under the Confrontation Clause.

 These facts alone make the instant case distinguishable because (1) no one from the hospital testified at defendant’s trial and (2) the missing witness was not a laboratory technician who had worked in conjunction with a primary treating doctor, but the primary doctor himself.

 Baber cited Garlick favorably and quoted extensively from it.

 The dissent contends that “[t]here is simply no principled distinction for applying the Confrontation Clause differently when analyzing psychiatric medical treatment than when analyzing medical treatment for ‘physical’ illnesses ... .” Post at 586. Other courts, including those cited favorably in Melendez-Diaz, disagree. See, e.g., Garlick, 313 Md at 220-221. We think that the distinction these courts discern is both plain and principled. For instance, see New York Life Ins Co v Taylor, 79 US App DC 66, 73-74; 147 F2d 297 (1945), in which the court articulated how psychiatric diagnoses are distinctive for purposes of confrontation:
It is no reflection upon the profession of psychiatry to say that it necessarily deals in a field of conjecture. Even in the diagnosis of actual insanity, cases are rare in which trained psychiatric witnesses do not come to opposite conclusions. ... It is difficult to conceive of records in which the right of cross-examination is more important than the conjectures of a psychiatrist on a psycho-neurotic condition.
See also Gregory, 40 Md App at 326 (“Psychiatry — particularly the forensic branch of it — is an inexact science... . Considering the less-than-certain and ever shifting state of the art, these opinions, given their ultimate potential effect, cry out for cross-examination.”); Phillips, 452 F2d at 347 (explaining that the “danger” inherent in the introduction of psychiatric diagnoses without cross-examination is especially present when “the reports consist of opinions and conclusions which are stated without a detailed explication of either the facts or reasoning processes on which they are based”); State v Cosgrove, 181 Conn 562, 575 n 10; 436 A2d 33 (1980) (noting that “the best reasoned” cases that have held medical reports inadmissible “include those whose ratio decidendi appears to be that the opinions at issue in the reports are of kind which are frequently subject to varying interpretations”).

 In addition to Baber and Garlick, see, e.g., United States v Oates, 560 F2d 45,81 (CA 2, 1977); Henson v State, 332 A2d 773, 776 n 8 (Del, 1975); Manocchio v Moran, 919 F2d 770, 780 n 17 (CA 1, 1990); Reardon v Manson, 491 F Supp 982, 986 (D Conn, 1980); Cosgrove, 181 Conn at 575 n 10; State v Henderson, 554 SW2d 117, 118 (Tenn, 1977).

 Indeed, even the dissent in Bullcoming, which states that “the danger [to which the confrontation clause is addressed] is that innocent defendants may be convicted on the basis of unreliable, untested statements by those who observed — or claimed to have observed — preparation for or commission of the crime,” seems more compatible with the result reached by this opinion than with that reached by the dissent. Bullcoming, 564 US at_; 131 S Ct at 2726 (Kennedy, J., dissenting).

 The dissent asserts that this formulation, taken directly from Crawford and reiterated in Melendez-Diaz, does not resolve our case “because Crawford’s various potential definitions of ‘testimonial’ do not lead to a clear result one way or the other .. . .” Post at 588 n 69. We respectfully believe the dissent misreads Crawford. This decision cannot he read to require that a statement must fall within all of its “ ‘[v]arious formulations of this core class of ‘testimonial statements’ ” in order to be considered testimonial. Crawford, 541 US at 51. Indeed, the very statements at issue in Crawford hardly satisfied all the formulations because Sylvia Crawford’s statements to the police in the course of an interrogation were clearly not, for example, “ ‘extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions!.]’ ” Id. at 51-52. The fact that a particular formulation does not apply to Dr. Shahid’s report is hardly fatal to defendant’s case because the Supreme Court does not require that, after we have identified that a statement is testimonial under an accepted formulation, we continue to apply all other formulations in sequence. To be clear, we do not treat as controlling any particular Crawford formulations. Rather, we simply recognize that the Court has expressly declined to adopt a single controlling definition of “testimonial,” thereby leaving all of its formulations viable, one of which squarely applies to Dr. Shahid’s report.

 The words that actually appear in Melendez-Diaz, 557 US at 311, are “sole purpose.” Specifically, the Supreme Court explained that *558 “under Massachusetts law the sole purpose of the affidavits was to provide ‘prima facie evidence of the composition, quality, and the net weight’ of the analyzed substance, Mass. Gen. Laws, ch. 111, § 13.” Id. We address the relevance of these words later in this opinion.

 Melendez-Diaz illustrates this point. In the context in which the statements in Melendez-Diaz were made, which involved state laboratory analysts preparing affidavits whose “sole purpose” was for use at a criminal trial, the Court did not engage, and could not, have engaged, in a “primary purpose” inquiry. Such an inquiry would have made no sense in that context since the affidavits in controversy had only one obvious and undisputed purpose.

 We are not persuaded by State v Stahl, 111 Ohio St 3d 186; 855 NE2d 834 (2006), or the cases from other jurisdictions relied on by the dissent. Not only does each of these concern sexual assault examinations, but it also appears that they represent the minority view. See Hernandez v State, 946 So 2d 1270, 1284-1285 (Fla App, 2007) (surveying the authority regarding whether a sexual assault victim’s statement to a medical professional was testimonial and deciding, in conformity with the “weight of authority in other jurisdictions that have decided cases involving similar facts,” that it was).

 In his dissent in Bryant, Justice Scalia had further words concerning what he described as the “ ‘highly context-dependent inquiry,’ ” *561 which the majority employed. See Bryant, 562 US at_; 131 S Ct at 1175-1176 (Scalia, J., dissenting) (“[T]he admissibility of a statement now turns on ‘a highly context-dependent inquiry’ into the type of weapon the defendant wielded; the type of crime the defendant committed; the medical condition of the declarant; if the declarant is injured, whether paramedics have arrived on the scene; whether the encounter • takes place in an ‘exposed public area’; whether the encounter appears disorganized; whether the declarant is capable of forming a purpose; whether the police have secured the scene of the crime; the formality of the statement; and finally, whether the statement strikes us as reliable.”) (citations omitted).

 Further, with regard to the dissent’s second prong, the “formality of the statement within a criminal investigation or prosecution,” post at 577-578, see n 11 of this opinion. We do not think that the report is lacking in formality sufficient to exclude it from being considered “testimonial” under the Confrontation Clause.

 The application of the plain error standard leads us to inquire into what Dr. Shahid might have said had he testified. What if, when asked to *564 explain Ms diagnosis, he could not articulate Ms reasons? What if Ms rationale was not viewed as compelhng? What if he had explained that Ms diagnosis of “no psychosis” did not necessarily mean that defendant was not legally msane at the time of the incident and that the prosecutor’s expert had misinterpreted Ms diagnosis? What if, on the basis of new research or upon further reviewing defendant’s medical files, he had modified Ms diagnosis? Or what if, on cross-examination standing face to face with defendant, he simply told the jury that he harbored some doubts about whether defendant was experiencing “psychosis,” or might have lost touch with reality at the time of the incident? What if he was just an ineffectual witness? These hardly exhaust the list of “what ifs,” the answer to any one of wMch might have altered the outcome of defendant’s trial.