*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

TONY ALLEN CLARK,

Defendant-Appellee.

UNPUBLISHED
March 12, 2019

No. 344191
Berrien Circuit Court
LC No. 2017-005206-FH

Before: RIORDAN, P.J., and MARKEY and LETICA, JJ.

PER CURIAM.

In this domestic violence action, the prosecution appeals by leave granted[1] the trial court's order excluding as inadmissible statements made by the complainant to a law enforcement officer who responded to a 911 call for help.[2] The trial court held that the complainant made these statements in response to police questioning after the emergency had subsided and, therefore, her statements were inadmissible under the Sixth Amendment's Confrontation Clause because they were testimonial in nature. We affirm.

Defendant, Tony Allen Clark, is charged with arson, preparation to burn, MCL 750.79(1)(d)(*vi*); domestic violence, third offense, MCL 750.81(5); assault with a dangerous weapon, MCL 750.82; possession of a firearm during the commission of a felony, MCL 750.227b; and malicious destruction of property less than $200, MCL 750.377a(1)(d). Pursuant to MCL 768.27c, the prosecution filed a notice of intent to present evidence of the complainant's

---

[1] *People v Clark*, unpublished order of the Court of Appeals, entered October 2, 2018 (Docket No. 344191).

[2] Anticipating that the complainant would not appear at trial, the prosecution sought a pretrial evidentiary ruling permitting the admission of the complainant's statements through the responding law enforcement officer's testimony under the statutory hearsay exception established by MCL 768.27c.

911 call and her later statements to the responding law enforcement officer. Clark objected to the notice, claiming that the admission of these statements without the presence of the complainant would violate his confrontation right.

The trial court held a hearing on the motion, at which one of the responding law enforcement officers was the sole witness. Deputy Nicholas Brian VonKoenig of the Berrien County Sherriff's Office testified that on December 25, 2017, at around 2:00 a.m., he and two other officers responded to a 911 dispatch call concerning possible domestic violence. Dispatch advised that a woman called 911 seeking help and "to hurry." Because of bad weather, it took law enforcement approximately 20 or 25 minutes to respond. Dispatch also advised that the woman reported that a weapon was involved. When the deputy arrived, he observed "a male leave the front half of the house into another section of the home," and he heard yelling and "some loud banging." The officers entered the residence through the kitchen and observed Clark yelling at a woman at the other end of the house. Deputy VonKoenig said that Clark "was angry, upset, yelling," and that, at first, Clark did not notice their arrival. The deputy ordered him back into the kitchen where the officers had entered, and Clark complied. The officers did not locate any weapons when they detained and searched Clark.

Deputy VonKoenig identified the woman as the complainant and explained that she lived at the residence with Clark. The deputy described the complainant as "very shaken up" and frightened. He spoke with the complainant in the living room area, while the other officers detained Clark in the kitchen. Deputy VonKoenig could hear Clark shouting in the other room, saying "it wasn't true" and yelling about "getting sent away." Because it was interfering with his ability to question the complainant, the deputy walked back to the kitchen and told Clark to be quiet. The deputy was certain that the complainant heard him do so. Because of Clark's "outburst," the officers removed him from the home and placed him in the back of a patrol vehicle.

The deputy described the residence as "a decent size house," observing that there was no direct line of sight from the living room to the kitchen, separated by a wall and about 25 or 30 feet accessed by a narrow hallway. He recalled that the house "was kind of in a mess" and that a lot of property appeared destroyed. He specifically mentioned a "large Zippo lighter fluid can," which he observed on a mattress in the living room.

Deputy VonKoenig testified that the complainant told him about what had transpired and Clark's "specific physical threats." The complainant advised that Clark was intoxicated and was "upset about a camera." She also said that Clark "threatened animals they had," including a lizard, a dog, and several cats. The deputy recalled seeing a dog and the lizard, but he did not recall seeing any cats. In addition, the complainant said Clark was "dumping Zippo lighter fluid around the house, threatening to light it on fire," and that, at one point, "he pulled out a firearm and held it to her face, threatening to kill her." Deputy VonKoenig did not relate what questions he asked the complainant, only testifying as to her responses.

On cross-examination, Deputy VonKoenig confirmed that Clark immediately complied with the officers' verbal order to put up his hands, at which point Clark was detained and handcuffed. Although he noticed the lighter fluid bottle, he could not recall smelling or seeing any type of flammable liquid around the kitchen, hallway, or living room and had no fear that

there was any danger of the home catching fire. If he had thought there was any danger, the deputy admitted that he would not have remained in the home. He was not concerned about Clark accessing a firearm because Clark was handcuffed and "other officers were standing with him." The deputy agreed that the primary reason Clark was moved to the vehicle was so that the deputy could continue interviewing the complainant without interruption.

The trial court held that the complainant's statements to the 911 operator and responding police officers were substantively admissible under MCL 768.27c because they were made to law enforcement officers, related to domestic abuse, and were made under circumstances that indicated trustworthiness.[3] Furthermore, the statements the complainant made during the course of the 911 call were nontestimonial as she was informing the operator of emergency events transpiring in real time. However, the trial court held that statements made by the complainant in response to questioning by Deputy VonKoenig "after [d]efendant was handcuffed and detained by another deputy in a different room of the residence cannot be found to be part of an ongoing emergency and therefore are inadmissible as testimonial in nature." The trial court denied the prosecution's motion for reconsideration. The prosecution now appeals.

Whether the admission of evidence violates a defendant's Sixth Amendment right to confront his or her accuser is a question of constitutional law that this Court reviews de novo. See *People v Nunley*, 491 Mich 686, 696-697; 821 NW2d 642 (2012). We review the trial court's factual findings for clear error. *People v Fackelman*, 489 Mich 515, 571; 802 NW2d 552 (2011). We hold that the trial court did not err in excluding statements the complainant made in response to law enforcement questioning. These statements were testimonial in nature because they did not relate to an ongoing emergency but rather concerned past events relevant to a potential criminal prosecution.

"In MCL 768.27c, the Legislature determined that under certain circumstances, statements made to law enforcement officers are admissible in domestic violence cases." *People v Meissner*, 294 Mich App 438, 445; 812 NW2d 37 (2011). This provision is "a substantive rule of evidence reflecting specific policy concerns about hearsay[4] in domestic violence cases." *Id*. Nevertheless, this Court recognized in *Meissner* that "[c]ertain testimony offered pursuant to MCL 768.27c may be subject to challenge based on the Confrontation Clause" of the United States Constitution and its state constitutional counterpart. *Id*. at 446 n 2.

---

[3] In his appellate brief, Clark attempts to use the prosecutor's appeal as an opportunity to challenge the trial court's ruling regarding the 911 call, arguing that the complainant's statements to the operator were not "made under circumstances that would indicate the statement's trustworthiness," as required by MCL 768.27c(1)(d). We decline to address this argument at this juncture because Clark did not properly raise it in a cross-appeal pursuant to MCR 7.207. See *People v Kieronski*, 214 Mich App 222, 225 n 2; 542 NW2d 339 (1995).

[4] " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Subject to certain exceptions, hearsay is generally inadmissible. MRE 802.

Consistent with *Meissner*, the parties agree with the unremarkable proposition that evidence may satisfy the statutory hearsay exception requirements of MCL 768.27c and yet be inadmissible at trial if its admission would violate a defendant's constitutional right to confrontation. See *id*. "[O]ut-of-court statements that are testimonial are barred under the Confrontation Clause unless the declarant is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the declarant, *regardless of whether the statements are otherwise deemed reliable under the rules of evidence*." *People v Lonsby*, 268 Mich App 375, 390; 707 NW2d 610 (2005) (emphasis added). Therefore, in resolving this appeal, we must determine whether the statements made by the complainant to Deputy VonKoenig were testimonial.

As our Supreme Court has noted, *Fackelman*, 489 Mich at 525, the Sixth Amendment of the United States Constitution provides a right of confrontation through language nearly identical to the Michigan Constitution: "*In all criminal prosecutions*, the accused shall enjoy the right . . . *to be confronted with the witnesses against him . . . .*" US Const, Am VI (emphasis added). The United States Supreme Court held that the Confrontation Clause prohibits the admission of "testimonial statements" of a witness who does not appear at trial unless the witness is declared unavailable and the defendant had a prior opportunity for cross-examination. *Crawford v Washington*, 541 US 36, 53-54; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Although *Crawford* explained that "[s]tatements taken by police officers in the course of interrogations," are necessarily testimonial, it declined to define what it meant by "interrogation." *Id*. at 52. Subsequent cases have shed additional light on this question. In *Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006), the United States Supreme Court, although again expressly declining "to produce an exhaustive classification of all conceivable statements," clarified the distinction between a testimonial and a nontestimonial statement, holding:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They *are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.* [Emphasis added.]

*Davis*, and its companion case, *Hammon v Indiana*, both involved domestic violence. In *Davis*, the declarant made statements to a 911 operator during a domestic disturbance concerning her former boyfriend, telling the operator that "He's here jumpin' on me again," and "He's usin' his fists." *Id*. at 817. The Supreme Court held that the declarant's statements were nontestimonial because she "was speaking about events *as they were actually happening*, rather than describ[ing] past events" and that any reasonable listener would objectively recognize "the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." *Id*. at 827 (quotation marks and citation omitted; alteration in original). Accordingly, the *Davis* Court concluded that the circumstances of the interrogation "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." *Id*. at 828.

In *Hammon*, police responded to a domestic disturbance call. *Id*. at 819. The declarant maintained that "nothing was the matter" and gave police permission to enter the house. *Id*. (quotation marks omitted). Inside the house, the police observed a damaged gas heating unit with its glass front shattered on the floor. *Id*. One officer remained with the alleged assailant while another spoke with the declarant in another room. *Id*. The assailant became angry when the police required him to stay separated from the declarant, who signed an affidavit describing how the assailant broke the furnace, shoved her down into the broken glass, hit her in the chest, broke their lamps and phone, and attacked her daughter. *Id*. at 819-820. Although the declarant did not appear at the trial, the trial court admitted her statements under state evidentiary rules. *Id*. at 820. The Court held it "entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct," and that, viewed objectively, "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime[.]" *Id*. at 829-830. Although the interrogation was not conducted at a police station, there was a certain formality to it. *Id*. at 830. The police forcibly separated the defendant from the declarant and the officer and did not permit the defendant to participate. *Id*. Moreover, the statements "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," and the interrogation "took place some time after the events described were over." *Id*. The Court rejected the state Supreme Court's implication that " 'initial inquiries' " by police officers at a crime scene are never testimonial, explaining that where "statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial." *Id*. at 832.

In *Michigan v Bryant*, 562 US 344, 359; 131 S Ct 1143; 179 L Ed 2d 93 (2011), the United States Supreme Court again addressed the primary purpose test, but this time in the context of a nondomestic dispute where the " 'ongoing emergency' " extended "beyond an initial victim to a potential threat to the responding police and the public at large." The Court distinguished domestic violence cases, recognizing that these types of cases "often have a narrower zone of potential victims than cases involving threats to public safety." *Id*. at 363. Accordingly, its decisions in *Davis* and *Hammon* "focused only on the threat to the victims and assessed the ongoing emergency from the perspective of whether there was a continuing threat to *them*." *Id*. The Court also reaffirmed that "whether an emergency exists and is ongoing is a highly context-dependent inquiry," *id*., and that "the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry," *id*. at 374, but "simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation," *id*. at 366.

Accordingly, as the Supreme Court did in *Crawford*, *Davis*, and *Hammon*,

> when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the "primary purpose of the interrogation" by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. [*Id*. at 370.]

In this case, the prosecution's primary argument is that the testimony suggested that the complainant was actually unaware that the emergency had ended. It directs this Court's attention to the Supreme Court's statement in *Bryant* that "the parties' perception that an emergency is

ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial," *id*., arguing that if the focus is on ending a threatening situation, the potential of fabrication is diminished. But because the inquiry is an objective one, we do not overvalue the complainant's actual perception, which, in any event, is speculative without her testimony. Rather, after examining the testimony of Deputy VonKoenig, we conclude that any objective participant in the position of the complainant or the deputy would have naturally understood that the emergency was over and that the questioning was for the purpose of collecting evidence for subsequent use in a criminal prosecution.

It is absolutely certain that Deputy VonKoenig, from his perspective and experience as a police officer, was aware that the emergency had ended. He testified that he had no concern for his safety. He further testified that he asked the other officers to remove Clark from the home and into a patrol car for the very purpose of allowing him to conduct his interview without Clark's interference. We cannot know from this record how the complainant may have perceived the situation. But from the deputy's testimony, we easily identify all of the hallmarks of an investigatory interview similar to the circumstances the United States Supreme Court found testimonial in *Hammon*. Although the complainant may not have known exactly what was taking place in the kitchen, no reasonable participant would still believe that Clark posed a danger after his removal from the home. It seems similarly unlikely that, even before Clark's removal, a reasonable participant would think themselves in any danger after hearing the police verbally direct Clark to put his hands up and submit to their authority. To the contrary, a reasonable participant would objectively recognize that, with knowledge that Clark was recently reported to be in possession of a gun, the responding police officers would take steps to restrict his freedom of movement and ensure he did not pose a continuing threat. The prosecution points to no portion of the complainant's statements relevant to counteracting an ongoing emergency. Rather, the statements appear to solely relate past events possibly relevant to a criminal prosecution. *Davis*, 547 US at 822.

We find the prosecution's emphasis on the reported involvement of a gun unpersuasive. The prosecution cites a statement from *Bryant*, 562 US at 364, distinguishing *Hammon* and suggesting that it was significant that the assailant in *Hammon* was unarmed. The prosecution takes this statement from *Bryant* entirely out of context. Initially, the statement from *Bryant* is nothing more than dicta suggesting that, perhaps, "separation by a single household wall" *might* have been insufficient to end the emergency if the assailant had been armed. *Id*. Moreover, the *Bryant* Court expressly recognized that the circumstances presented in that case concerned a nondomestic dispute where the ongoing emergency "extend[ed] beyond an initial victim to a potential threat to the responding police and the public at large." *Id*. at 359. In this domestic abuse disturbance, there was no remaining threat once Clark submitted to police authority. And although the officers did not initially locate the reported gun, Deputy VonKoenig had no fear for his or anyone else's safety after Clark was searched and restrained. Again, we conclude that no

one in the complainant's position would reasonably believe that the emergency was continuing after police responded to the 911 call and subdued Clark.[5]

Considering all of these circumstances from an objective standpoint, the complainant's statements to Deputy VonKoenig unmistakably recounted "what happened," rather than "what is happening." See *Davis*, 547 US at 830 (quotation marks omitted). These statements were testimonial in nature because they did not relate to an ongoing emergency but rather concerned past events relevant to a possible criminal prosecution. See *id*. at 822.

Affirmed.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ Anica Letica

---

[5] The prosecution also suggests that it is speculative whether the complainant knew Clark submitted to police authority. We cannot agree. Deputy VonKoenig testified that he believed that the complainant heard him tell Clark to be quiet when the other officers removed him from the home to a patrol car. In any event, it is a fair inference that the complainant would have heard or understood what was happening in response to her 911 call for police assistance. The trial court correctly understood that the test is objective and, consequently, whether the complainant actually heard the officer give the command or saw Clark submit to police authority is not outcome determinative.