*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTHONY JOSEPH GELIA,

        Defendant-Appellant.

UNPUBLISHED
January 21, 2020

No. 344130
Jackson Circuit Court
LC No. 16-005361-FC

Before: CAMERON, P.J., and SHAPIRO and SWARTZLE, JJ.

PER CURIAM.

Defendant forcibly entered a home and discharged a handgun multiple times, while streaming live video of his conduct on social media. One of the bullets shot by defendant struck and killed a woman who was with her young child. Defendant appeals as of right from the jury conviction of first-degree felony murder and other crimes, arguing that he received ineffective assistance of counsel, that his sentence for the conviction of first-degree felony murder constituted cruel and unusual punishment, and that the trial court erred when it admitted into evidence the audio recording of a 911 call and a video that defendant recorded of his own conduct before the shooting. We affirm.

## I. BACKGROUND

This case arises from the death of a woman in Jackson, Michigan, in November 2016. On the night in question, defendant was with his girlfriend and his brother's ex-girlfriend, who drove him to a house in Jackson. The driver informed defendant that his brother was staying at the house. Various witnesses testified that defendant's brother was indeed present in the house, where he had been staying with defendant's ex-girlfriend.

Upon arrival, defendant violently forced open the door to the house, wielding a handgun in one hand and his cellphone in the other. Defendant recorded himself breaking into the house and firing his handgun several times. Defendant did not record the entire incident, however, and witness testimony presented at trial indicated that defendant fired his handgun a total of nine times, while nine shell casings were found in the house. Defendant fired four shots into the living-room floor, one shot into a kitchen cupboard, and four shots in the basement. One of

those shots struck and killed the victim. At trial, defendant did not contest that he forcibly entered the house, that he fired the handgun inside the house, and that he fired the shot that killed the victim.

The homeowner testified that he was upstairs when he heard a knock at the front door. He looked out the window and saw a vehicle he did not recognize. As he headed downstairs, he saw defendant kick in the front door and begin firing a handgun. The homeowner admitted that defendant never spoke to him, looked at him, pointed the handgun at him, or moved toward him. Instead, defendant moved through the living room, firing the handgun. The homeowner retreated upstairs and called 911, and the prosecutor played an audio recording of this 911 call for the jury.

The victim, her child, and her boyfriend were all in the basement when defendant began shooting. The victim's boyfriend testified that defendant pointed a handgun at him while defendant was on the stairs leading to the basement, and that defendant fired twice at him. The victim's boyfriend also described how he ran into a bedroom, slammed the door, called 911, and then heard additional gunshots. He testified that defendant saw him enter the bedroom and close the bedroom door. Although defendant never attempted to enter the bedroom after him, defendant shot twice through the door. Once in the bedroom, the victim's boyfriend called 911. As he did so, he noticed the victim lying on the ground with her eyes open. He noticed blood and began to scream and yell for the victim.

The trial court allowed the prosecutor to play an audio recording of the boyfriend's 911 call for the jury. Before trial, defendant had moved to exclude the recording of this 911 call from evidence, arguing that it was not relevant under MRE 401 and unfairly prejudicial under MRE 403. At the pretrial motion hearing, the trial court rejected defendant's arguments and ruled that the recording was admissible. Accordingly, the trial court allowed the prosecutor to play the 911 call for the jury at trial.

After firing his handgun in the house, defendant fled the scene. Paramedics arrived and transported the victim to the hospital where she was pronounced dead from a gunshot wound. Meanwhile, police stopped and arrested defendant in his vehicle. Defendant was in possession of a handgun on which the serial number had been obliterated. The arresting police officer testified that defendant had alcohol on his breath and that his speech was slurred at the time of his arrest.

Police interviewed defendant and the prosecutor played a recording of the interview for the jury. In that interview, defendant confessed to the shooting. Defendant stated that he was with his girlfriend and his brother's ex-girlfriend on the night of the shooting. He claimed that his brother had threatened to kill him. He stated that, when he arrived at the house in Jackson, he peeked in the window and saw his ex-girlfriend in the living room. Defendant admitted that he had loaded 13 bullets into the handgun, and that he fired shots inside the house, but claimed that he was not aiming at anyone because he just wanted to scare everyone in the house. Defendant stated that he deserved to go to prison for what he had done, and that he planned to flee to Mexico after the shooting. Numerous times during this interview, defendant expressed the desire to kill himself.

During this interview, defendant also told police that he had consumed marijuana and alcohol, that he was intoxicated, and that he was too drunk to drive his own vehicle. Accordingly, police administered a breathalyzer test to defendant. Although the prosecutor did not admit the results of the breathalyzer test into evidence, the interviewing officer stated that the test revealed a .09 bodily alcohol content, which exceeded the legal limit for driving a motor vehicle. The police officer testified, however, that he thought defendant was not too intoxicated to have a cogent conversation with police during the interview.

The next day, police again interviewed defendant. The prosecutor played a recording of the second interview for the jury. At this second interview, defendant told police that he was drunk and that he had taken Xanax on the day of the shooting. Defendant did not claim that he had taken Xanax involuntarily or that someone had slipped it into his drink without his knowledge. Defendant again confessed to the shooting, but stated that he was persuaded to do what he did by his brother's ex-girlfriend. When defendant realized that he had killed someone, he lamented, "I just killed someone's mom," and asked if he was going to be spending the rest of his life in prison.

During cross-examination, the police officer who interviewed defendant admitted that defendant had the opportunity to shoot one of the guests in the living room, but that instead of doing so, defendant only fired shots into the living-room floor. The investigating officer also conceded that defendant was consistent in stating—during his interviews with police— that he did not intend to kill anyone.

Police obtained two videos of defendant's conduct that had been posted to social media on the night of the incident. The trial court allowed the prosecutor to play these videos for the jury, over defendant's objection. In the first video, defendant stated several times that he wanted to shoot or kill people. Specifically, defendant made repeated threats to shoot police officers. Defendant also made more threats to shoot other people or saw their heads off, and the video showed him running one of the chainsaws that he had in the vehicle, while making these threats. Defendant stated on the video that he was going to prison and joining the Aryan Brotherhood. The second video showed defendant breaking into the house and firing the handgun multiple times.

Defendant chose not to testify in his own defense.

On appeal, defendant admits that he was evaluated before trial for competency and criminal responsibility. Defendant further admits that the examiner found him competent to stand trial and that the examiner determined that the available information did not support a defense of temporary insanity. At a pretrial motion hearing regarding the admissibility of the videos, defense counsel stated on the record that he had considered raising a temporary-insanity defense, but that he chose not to do so because defendant's intoxication on the date of the shooting appeared to him to be voluntary. As defense counsel stated:

> There is some testimony that will be coming through the video with the officer of [defendant] being on Social Security Disability for ODD, ADHD, and some other issues. I just want the record to be clear that I have researched ODD, I have researched ADHD, I have sent him to forensics, that being [defendant], I

-3-

have reviewed those forensic reports yet again this weekend. I cross referenced those with other cases with individuals with ODD and ADHD to determine whether or not I needed to seek potentially an expert regarding his mental state of mind on that evening. And again, I'm just making a record because I've looked at all those avenues and I don't see where I can, because of the voluntary intoxication, do that. So, I have reviewed that with [defendant]. He is aware of our trial strategy at this point. I mean, it really doesn't change my trial strategy too much, so we're prepared for trial to start tomorrow, your Honor.

At trial, defense counsel did not argue that defendant was not guilty of first-degree home invasion or possession of a firearm during the commission of a felony. Instead, defense counsel argued that defendant was guilty of involuntary manslaughter, rather than first-degree or second-degree murder. Therefore, it is apparent that defense counsel's trial strategy was to create reasonable doubt regarding defendant's intent and lack of premeditation at the time of the shooting, rather than to argue temporary insanity.

The jury acquitted defendant of first-degree premeditated murder, MCL 750.316(1)(a), but convicted defendant of first-degree felony murder, MCL 750.316(b), first-degree home invasion, MCL 750.110(a)(2), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). The trial court sentenced defendant to concurrent sentences of life in prison without the possibility of parole for his conviction of first-degree felony murder, 14 to 20 years in prison for his conviction of first-degree home invasion, and a consecutive sentence of two years in prison for his conviction of felony-firearm.

Defendant submits on appeal an affidavit from a psychiatrist, Dr. Gerald A. Shiener, opining that "it is possible" that a 20-year-old man with a diagnosis of Attention Deficit Disorder and Oppositional Defiant Disorder who consumes alcohol and Xanax might become temporarily insane. In that affidavit, the psychiatrist conceded that he did not personally evaluate defendant and he did not opine that defendant was temporarily insane at the time he committed the shooting.

Defendant also submits on appeal an affidavit from his appellate counsel recounting defendant's statements to his appellate counsel that defendant's girlfriend told him that she saw his brother's ex-girlfriend slip Xanax into his drink on the night of the incident. Defendant does not offer an affidavit from his brother's ex-girlfriend, who purportedly placed the Xanax in his drink, or from his girlfriend, who purportedly saw this happen. Notably, no testimony was offered at trial suggesting that defendant consumed Xanax involuntarily on the night of the shooting, and defendant has offered no testimony by way of affidavit that any witness is willing to testify that he did so.

Defendant now appeals, arguing that he received ineffective assistance of counsel, that his sentence for the conviction of first-degree felony murder constituted cruel and unusual punishment, and that the trial court erred when it admitted into evidence the video taken by defendant before the shooting and the audio recording of the 911 call made by the victim's boyfriend.

II. ANALYSIS

-4-

## A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that he received ineffective assistance of counsel because defense counsel did not secure an expert witness to testify that he was temporarily insane at the time of the shooting. We conclude that defendant's argument is without merit.

Determining whether a defendant received ineffective assistance of counsel is a mixed question of fact and constitutional law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). This Court reviews findings of facts for clear error and questions of law de novo. *Id.* When the trial court does not hold an evidentiary hearing, there are no factual findings to which the reviewing court must defer, and this Court's review is limited to mistakes apparent from the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

To receive a new trial based on ineffective assistance of counsel, defendant must show both that counsel's representation fell below an objective standard of reasonableness, and a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Accordingly, a defendant must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "Because defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

The failure to call a witness can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). A defense is substantial if it is one that might have made a difference in the outcome of the trial. See *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009). Defense counsel is afforded wide latitude on matters of trial strategy, and we will not substitute our own judgment for that of defense counsel on matters of trial strategy. See *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008). There are countless ways to provide effective assistance in any given case, and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *People v Fackelman*, 489 Mich 515, 598; 802 NW2d 552 (2011), quoting *Strickland*, 466 US at 689. "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy," *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009), and the "fact that the strategy chosen by defense counsel did not work does not constitute ineffective assistance of counsel," *People v Williams*, 240 Mich App 316, 332; 614 NW2d 647 (2000).

Essentially, defendant argues that his trial counsel should have pursued a defense strategy of arguing temporary insanity, and that counsel's failure to pursue that strategy constituted ineffective assistance. This argument is without merit. Defense counsel presented a substantial defense that defendant lacked the requisite intent to establish premeditation and deliberation. For example, defense counsel questioned the homeowner during cross-examination about defendant breaking into the house and how defendant never spoke to, looked at, pointed the handgun at, or moved toward the homeowner. Defense counsel also questioned the victim's boyfriend about how defendant saw him enter the bedroom and close the door, but that defendant never entered

the bedroom in pursuit. Moreover, defense counsel questioned the police officer who interviewed defendant to elicit testimony that defendant had the opportunity to shoot one of the guests in the house, but he instead fired shots into the living-room floor. Choosing to argue that defendant lacked the requisite intent, which led to defendant's acquittal of first-degree premeditated murder, was a reasonable trial strategy. We will not substitute our own judgment for that of defense counsel regarding his choice of trial strategy. See *Unger*, 278 Mich App at 242-243.

Nonetheless, defendant cites *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), for the proposition that defense counsel should have called an expert witness to opine that defendant was temporarily insane at the time of the shooting. *Ackley* is distinguishable, however, because the defense counsel in that case never "read any medical treatises or other articles about the medical diagnoses at issue." *Id.* at 386. In this case, defense counsel stated on the record at a pretrial motion hearing that he thoroughly researched defendant's medical issues and considered raising an insanity defense, but decided against it because of defendant's voluntary intoxication. To establish an insanity defense, a defendant must show that, as the result of a mental illness, the defendant lacked the "substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law." *People v Lacalamita*, 286 Mich App 467, 470; 780 NW2d 311 (2009) (cleaned up). Yet, a defendant "who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances." MCL 768.21a(2). In defendant's recorded statements to police, he admitted that he voluntarily consumed alcohol on the night of the shooting. Therefore, defendant lacked a potential defense that he was temporarily insane.

Defendant attempts to refute the voluntariness of his intoxication by arguing that it was the combination of the alcohol and Xanax that may have caused him to become temporarily insane, and that he consumed the Xanax involuntarily, even if he consumed the alcohol voluntarily. Defendant's argument is not factually supported by the record. Defendant admitted to police that he consumed Xanax in combination with alcohol, but did not claim that he had taken Xanax involuntarily or that someone had slipped it into his drink without his knowledge. Furthermore, no testimony was offered at trial that defendant consumed Xanax involuntarily on the night of the shooting.

Defendant attempts to establish that his consumption of Xanax was involuntary by submitting an affidavit from his appellate counsel. In that affidavit, appellate counsel states that defendant told her that his girlfriend told him that she saw defendant's brother's ex-girlfriend "put Xanax in [defendant]'s alcoholic drink and that [defendant] drank it not knowing that it had been spiked." Notably, defendant does not offer an affidavit from his brother's ex-girlfriend, who allegedly placed the Xanax in defendant's drink, or from his girlfriend, who purportedly saw this happen. Appellate counsel's affidavit is not a proper offer of proof because it does not establish that any witness would testify on remand that defendant consumed Xanax involuntarily on the night of the shooting.

Defendant also argues that, even if he consumed both the alcohol and Xanax voluntarily, he was nonetheless entitled to raise the defense of temporary insanity. To support his argument,

defendant relies on *People v Conrad*, 148 Mich App 433; 385 NW2d 277 (1986).[1] In *Conrad*, a panel of this Court held that, although MCL 768.21a(2) excludes voluntary drug or alcohol intoxication from the definition of legal insanity, "if a defendant is actually and demonstrably rendered insane by the ingestion of mind-altering substances, an insanity defense is not absolutely precluded." *Id*. at 441. In that case, the defendant presented evidence that the ingestion of PCP caused defendant to suffer from a long-term mental illness, and it was that mental illness that gave rise to a potential insanity defense. Because there is no indication in this case that defendant's ingestion of Xanax caused him to suffer from a long-term mental illness, *Conrad* is readily distinguishable.

Furthermore, defendant's offer of proof regarding this issue is deficient. Defendant provided this Court with an affidavit from Dr. Shiener, opining that "it is possible" that a 20-year-old man with a diagnosis of Attention Deficit Disorder and Oppositional Defiant Disorder who consumes alcohol and Xanax might become temporarily insane. In that affidavit, the psychiatrist conceded that he did not personally evaluate defendant and he did not opine that defendant himself was temporarily insane at the time he committed the shooting. As the affidavit does not establish the factual basis for a conclusion that defendant's consumption of alcohol and Xanax in combination caused him to suffer from a long-term mental illness, as in *Conrad*, and does not establish how the consumption of alcohol and Xanax impacted this defendant specifically, defendant has not established the factual predicate for his claim of ineffective assistance of counsel. See *Carbin*, 463 Mich at 600.

Even if we agreed that defense counsel's representation fell below an objective standard of reasonableness, defendant would still be "required to demonstrate prejudice to obtain relief on a claim of ineffective assistance." *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004). To prove prejudice, defendant would have to prove a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 US at 694. Defendant did not argue that defense counsel's failure to call the now-desired expert witness would have resulted in a different outcome. Instead, defendant simply argues that the failure to call such an expert witness "may have" prejudiced him, and this is not sufficient. Accordingly, defendant has failed to establish that he is entitled to relief based on his counsel's failure to argue temporary insanity or to elicit testimony from an expert witness on this issue.

## B. CRUEL AND UNUSUAL PUNISHMENT

Defendant next argues that the trial court's imposition of a mandatory sentence of life in prison without the possibility of parole for the conviction of felony-murder violates his due-process rights and constitutes cruel and unusual punishment because he was only 19 years old at the time of the offense. Defendant essentially invites this Court to extend the United States

---

[1] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2013).

Supreme Court's holding in *Miller v Alabama*, 567 US 460, 465; 132 S Ct 2455; 183 L Ed 2d 407 (2012), to the facts of this case.

Because defendant did not raise this argument at sentencing, it is unpreserved for appellate review. This Court reviews unpreserved issues of constitutional error for plain error affecting defendant's substantial rights. See *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). To avoid issue forfeiture under the plain-error rule, defendant must prove the following: (1) there was an error, (2) the error was plain, and (3) the plain error affected substantial rights, i.e., the outcome of the trial-court proceedings. *Id*. at 763. Once defendant has established these requirements, this Court "must exercise its discretion in deciding whether to reverse." *Id*. Reversal is warranted only if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings or resulted in the conviction of an actually innocent person. See *id*.

The United States Constitution prohibits "cruel *and* unusual punishments," and the Michigan Constitution forbids "cruel *or* unusual punishment." US Const, Am VIII (emphasis added); Const 1963, art 1, § 16 (emphasis added). Michigan's prohibition against cruel or unusual punishment is interpreted more broadly than the federal prohibition. See *People v Bullock*, 440 Mich 15, 30-35; 485 NW2d 866 (1992). Accordingly, if a sentence is constitutional under Michigan's Constitution, it is also constitutional under its federal counterpart. *People v Nunez*, 242 Mich App 610, 618-619 n 2; 619 NW2d 550 (2000). A sentence constitutes cruel or unusual punishment when it is grossly disproportionate to the seriousness of the circumstances surrounding the offense and the offender. See *Bullock*, 440 Mich at 32. "In deciding if punishment is cruel or unusual, this Court looks to the gravity of the offense and the harshness of the penalty, comparing the punishment to the penalty imposed for other crimes in this state, as well as the penalty imposed for the same crime in other states." *People v Bowling*, 299 Mich App 552, 557-558; 830 NW2d 800 (2013).

In this case, defendant has not demonstrated that his sentence is cruel or unusual by comparing it to the penalties imposed for other crimes in this state and the same crime in other states. Nor has defendant demonstrated that he has the maturity of the typical defendant under the age of 18, or that he has lessened culpability or a greater capacity for change than other persons. Defendant simply argues that his birthdate and age on the date of the offense entitle him to relief from his sentence. Without any proof regarding his intelligence, maturity level, impulse control, appreciation for the consequences of his actions, appreciation for delayed gratification, and ability to control his actions, defendant has not demonstrated entitlement to relief on this issue. We decline to accept defendant's invitation to extend the holding in *Miller* in this case.

## C. ADMISSION OF EVIDENCE

Lastly, defendant argues that the trial court abused its discretion when it admitted the 911 call from the victim's boyfriend and the video taken by defendant before the shooting.

This Court reviews preserved claims of evidentiary error for an abuse of discretion. See *People v Bergman*, 312 Mich App 471, 482; 879 NW2d 278 (2015). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and

principled outcomes." *Id*. at 483 (cleaned up). "If the court's evidentiary error is nonconstitutional and preserved, then it is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *People v Douglas*, 496 Mich 557, 565-566; 852 NW2d 587 (2014) (cleaned up).

MRE 401 defines relevant evidence as evidence "having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 402 provides that all relevant evidence is admissible unless otherwise prohibited by the United States or Michigan Constitutions, the rules of evidence, or other rules adopted by the Supreme Court. MRE 403 prohibits the admission of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of the cumulative evidence. In the context of MRE 403, "prejudice means more than simply damage to the opponent's cause." *People v Vasher*, 449 Mich 494, 501; 537 NW2d 168 (1995). It means that evidence has an undue tendency to move the jury to decide on an improper basis such as an emotional bias. *Id*. Relevant considerations in determining unfair prejudice include whether the jury will give the evidence undue or preemptive weight and whether the use of the evidence is inequitable. See *People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995). Mere prejudice is insufficient to justify reversal of a conviction. *People v Albers*, 258 Mich App 578, 591; 672 NW2d 336 (2003).

In this case, the trial court admitted the videos that defendant recorded and posted to social media, over defendant's pretrial objection and motion to suppress. Defendant appeals only the admission of the video of his conduct leading up to the shooting. Defendant does not appeal the admission of the video that he recorded while committing the charged offenses. Defendant argues that his statements in the first video about killing police officers and joining the Aryan Brotherhood were not relevant to the shooting that he committed just minutes later and that these statements gave rise to unfair prejudice.

Importantly, the prosecutor offered the video to prove—with defendant's own words and conduct—that defendant possessed premeditation and deliberation sufficient to support a conviction of first-degree murder. Yet, the jury only convicted defendant of first-degree felony murder, first-degree home invasion, and felony-firearm, which suggests that the jury did not believe beyond a reasonable doubt that defendant had the requisite intent to have committed first-degree murder. Nonetheless, the trial court's decision to admit the video in its entirety was not outside the range of reasonable and principled outcomes. See *Bergman*, 312 Mich App 483. The videos could have allowed the jury to determine defendant's intent leading up to the shooting, notwithstanding the jury's actual verdict with the added benefit of hindsight.

Even assuming that defendant's statements and conduct depicted in the first video created the danger of unfair prejudice, the trial court properly instructed the jury that it was not to allow sympathy or prejudice influence its decision. A jury is presumed to follow its instructions. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). The challenged evidence was not substantially more prejudicial than probative. See *id*. at 235.

With regard to the 911 calls, defendant appeals only the admission of the second call placed by the victim's boyfriend; he does not appeal the admission of the call placed by the homeowner. Even assuming for the sake of argument that the second 911 call should not have been entered in evidence, reversal is not required because its admission was not outcome-determinative. See *Douglas*, 496 Mich at 565-566. Given the overwhelming evidence of defendant's guilt, the reliability of the outcome is not undermined by the admission of this evidence. See *id*.

Affirmed.

/s/ Thomas C. Cameron
/s/ Douglas B. Shapiro
/s/ Brock A. Swartzle