*If this opinion indicates that it is "FOR PUBLICATION," it is subject to*
*revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHARLES JACKSON,

        Defendant-Appellant.

UNPUBLISHED
February 09, 2026
9:23 AM

No. 375587
Ingham Circuit Court
LC No. 24-000611-FH

Before: O'BRIEN, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

Defendant is accused of physically assaulting the declarant. Following the assault, the declarant described the assault to a police officer. Before trial, the prosecution asked the court to allow that officer to testify about the declarant's statements if the declarant was unavailable to testify. Defendant objected to this on grounds that it would violate his right to confront the declarant. The trial court overruled defendant's objection, concluding that the declarant's statements were nontestimonial—and therefore their admission did not implicate the Confrontation Clause—because they were made during an ongoing emergency. Defendant appeals that ruling as on leave granted.[1] We reverse.

## I. BACKGROUND

This case arose after defendant allegedly assaulted his ex-girlfriend, the declarant. On the night of the assault, police responded to a call at a residence around 3:00 a.m. Officers knocked on the door of the residence and were let in, and the declarant was inside. Lansing Police Officer Tyler Stover then spoke with declarant to figure out why the police were called, and their conversation was recorded by Stover's body camera.

---

[1] *People v Jackson*, unpublished order of the Court of Appeals, entered August 15, 2025 (Docket No. 375587).

Over the course of about 25 minutes, the declarant told Stover about how she was assaulted by defendant. Asked to describe the assault, the declarant said that she pulled into the residence's driveway, and defendant pulled in behind her,[2] punched her through the window of her car, and took her phone. The declarant said that, when defendant returned to his car, the declarant tried to get her phone back, which resulted in defendant dragging the declarant down the street. The declarant also told Stover that defendant bit her face. After about 10 minutes, Stover told the declarant that dispatch had mentioned a gun, and he asked whether defendant had used a firearm during the assault. The declarant confirmed that, during the assault, defendant had pulled out a firearm and threatened to kill her.

Before trial, the prosecution filed a motion in limine to admit the declarant's statements to Stover under MCL 768.27c if the declarant was unavailable to testify. The prosecution contended that granting its motion would not violate the Confrontation Clause because the declarant's statements were nontestimonial, as they were made during an ongoing emergency. Defendant objected, arguing that the declarant's statements were testimonial and were not made during an ongoing emergency because it was obvious from Stover's bodycam footage that there was no active emergency when the declarant talked to Stover, and Stover was simply investigating what happened.

At a hearing on the prosecution's motion, the trial court held that the declarant's statements were nontestimonial because they were made during an ongoing emergency. The court reasoned that, while it was true that defendant had left the scene and the declarant was being interviewed by police when she made her statements, there was an ongoing emergency because defendant posed a threat the public, which the court defined as "anybody who . . . comes between the victim and Defendant," whether that be the declarant's "family," anyone in "the public at large" that declarant was with, or even "the police." The court added that its conclusion would be different if more time had passed and things had "calmed down" or the threat had "been neutralized," but under the facts of this case—particularly the fact that defendant was armed—the court found that there was an ongoing emergency.

This appeal followed.

## II. STANDARD OF REVIEW

Whether the admission of certain evidence would violate a defendant's right to confrontation presents a question of constitutional law, reviewed de novo. See *People v Washington*, 514 Mich 583, 592; 22 NW3d 507 (2024).[3]

---

[2] The declarant alleged that defendant had been stalking her for some time by somehow tracking her car.

[3] The prosecution posits that the trial court's finding of an ongoing emergency constitutes a factual finding, reviewed for clear error. But the only support that the prosecution cites for this proposition is the dissent in *Fackelman*, see *People v Fackelman*, 489 Mich 515, 571; 802 NW2d 552 (2011)

-2-

### III. DEFENDANT'S RIGHT TO CONFRONTATION

The Sixth Amendment of the United States Constitution and Article 1, § 20 of Michigan's Constitution each provide that, in a criminal prosecution, the accused shall have the right "to be confronted with the witnesses against" them. US Const, Am VI; Const 1963, art 1, § 20. This right "insures that the witness testifies under oath at trial, is available for cross-examination, and allows the jury to observe the demeanor of the witness." *Washington*, 514 Mich at 592 (quotation marks and citation omitted). Whether state or federal, the Confrontation Clause is concerned with "witnesses," meaning "those who 'bear testimony.' " *Crawford v Washington*, 541 US 36, 51; 124 S Ct 1354; 158 L Ed 2d 177 (2004); *People v Fackelman*, 489 Mich 515, 528; 802 NW2d 552 (2011). It follows that the Confrontation Clause applies to testimonial evidence, but it does not apply to *non*testimonial evidence. See *Crawford*, 541 US at 68; *Fackelman*, 489 Mich at 528.

While simple enough in theory, deciphering whether evidence is testimonial or nontestimonial has proven difficult in practice. As our Supreme Court observed, decisions addressing the Confrontation Clause

> seem not entirely consistent, they employ varying constitutional tests and formulations for discerning Confrontation Clause violations, they are lengthy and susceptible to having their language taken out of context, and the justices are sharply divided in these decisions, making it sometimes difficult to know which propositions of constitutional law have garnered the support of a majority of the Court. [*Id*. at 561-562.]

The only thing that is clear from the Confrontation Clause jurisprudence is that there is no "bright-line test for determining whether a statement is testimonial," and the jurisprudence has instead been developed "on a case-by-case basis." *Id*. at 560.

Turning to those cases, the parties agree that we need look no further than the decisions of the United States Supreme Court in *Davis v Washington*, 547 US 813; 126 S Ct 2266; 165 L Ed 2d 224 (2006), and *Michigan v Bryant*, 562 US 344, 353; 131 S Ct 1143; 179 L Ed 2d 93 (2011), to resolve their disagreement about whether the declarant's statements to Stover were testimonial or nontestimonial. This is presumably because *Davis* and *Bryant* deal with "the very specific context" of whether statements made to the police were testimonial. See *Fackelman*, 489 Mich at 558. We therefore discuss those cases, then apply their teachings to the facts of this case.

### A. *DAVIS*

*Davis* consisted of two cases—*Davis v Washington* and *Hammon v Indiana*—in which the United States Supreme Court was asked to decide "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial.' " *Davis*, 547 US at 817. In *Davis*, the declarant (McCottry) was a victim of domestic violence perpetrated by Davis, and McCottry's 911 call in which she said that Davis assaulted her was admitted into evidence at Davis's trial. *Id*.

---

(YOUNG, J., dissenting), which was reciting the standard of review for claims of ineffective assistance of counsel.

at 817-819. In *Hammon*, the declarant (Hammon's wife, Amy) told an officer who responded to a 911 call that Hammon had assaulted her, and after Amy failed to appear at Hammon's trial, the court allowed the officer to testify about what Amy said to him. *Id*. at 819-821. The United States Supreme Court explained that it took these cases "to determine more precisely which police interrogations produce testimony" subject to the Confrontation Clause, and it held that the facts of the cases before it could be decided by holding as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. [*Id*. at 822.]

Applying this holding to *Davis*, the Court explained that McCottry's statements to the 911 operator were clearly nontestimonial because they were made during an ongoing emergency. *Id*. at 827. The Court contrasted McCottry's describing "current circumstances requiring police assistance" with statements made during typical police interrogations that described "the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." *Id*. at 826-827. The Court further noted that McCottry's statements were elicited "to *resolve* the present emergency" as opposed to learning "what had happened in the past." *Id*. at 827. And the Court emphasized "the level of formality" in the 911 "interview" of McCottry, explaining, "McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id*. Given all this, the Court concluded that McCottry "simply was not acting as a *witness*" and "was not *testifying*" when she made statements to the 911 operator while calling for emergency assistance, as "[n]o 'witness' goes into court to proclaim an emergency and seek help." *Id*. at 828. Rather, McCottry was clearly facing an ongoing emergency, and the statements she made to the 911 operated were "to address the exigency of the moment." *Id*.

In *Hammon*, on the other hand, the Court held that Amy's statements were testimonial. *Id*. at 829. The Court explained that "[t]here was no emergency in progress" when the police interviewed Amy, as things had calmed down by the time police arrived and "there was no immediate threat to [Amy's] person." *Id*. at 829-830. The Court also noted that the officer's interview of Amy was not to figure out "what is happening" but "what happened." *Id*. at 830. The Court also emphasized the level of formality of Amy's interview—while observing that the interview could have been more formal (such as taking place in a police station while being taped), the Court concluded that the interview "was formal enough." *Id*. This was so because Amy was "actively separated from the defendant," her "statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," and Amy made these statements "some time after the events described were over." *Id*. The Court opined that, under these circumstances, Amy's statements were "an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." *Id*.

The Court then contrasted the facts of *Davis* and *Hammon*. The Court noted that, in *Davis*, McCottry was alone, "unprotected," and in immediate danger when she made her statements,

whereas, in *Hammon*, Amy was "protected" by police at the time. *Id*. at 831. The Court also observed that McCottry was seeking aid and her "statements showed immediacy," whereas Amy was giving a "narrative of past events," delivered after she was removed "from the danger she described." *Id*. at 831-832.

## B. *BRYANT*

A few years after *Davis*, the United States Supreme Court in *Bryant* revisited when statements made to police officers were nontestimonial. There, officers responded to a call that a man had been shot, and when they arrived at the scene, they found Anthony Covington lying on the ground with a gunshot wound to his abdomen. *Bryant*, 562 US at 349. The police spoke with Covington for about 5 to 10 minutes, asking him what happened, who had shot him, and where the shooting occurred. *Id*. Covington died shortly thereafter, but his statements led officers to defendant Richard Bryant, who was eventually charged and convicted of second-degree murder for killing Covington. *Id*. at 349-350. The officers who talked to Covington before he died testified at Bryant's trial about what Covington said to them, and the question before the United States Supreme Court was whether the admission of these statements violated Bryant's right to confrontation, which turned on whether Covington's statements to the officers were testimonial or nontestimonial. *Id*. at 350-351.

To decide this issue, the Court first recapped how *Davis* and *Hammon* "arose in the domestic violence context," and it explained that the facts of *Bryant* introduced "a new context: a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim." *Id*. at 359. This required the Court to confront, for the first time, circumstances that extended "beyond an initial victim to a potential threat to the responding police and the public at large." *Id*.

To do this, the Court began by repeating its holding from *Davis* that determining whether statements made to police during an interrogation were testimonial or nontestimonial turned on what the "primary purpose" was of the interrogation. *Id*. at 361. If, for instance, the primary purpose of the interrogation was to enable police assistance to address an ongoing emergency, then the declarant's statements were likely nontestimonial, making the existence of an ongoing emergency "among the most important circumstances for informing" the primary purpose of an interrogation. *Id*. But determining whether an ongoing emergency existed was "a highly context-dependent inquiry." *Id*. at 363. The Court explained that cases like *Davis* and *Hammon* that involve domestic violence generally assess the existence of an "ongoing emergency from the perspective of whether there [is] a continuing threat" to the victim, whereas other cases—such as those involving an unknown shooter—may assess the existence of an ongoing emergency from the perspective of whether there is a continuing threat to public safety. *Id*. at 363-364 Along similar lines, the Court explained that "the duration and scope of an emergency may depend in part on the type of weapon" used in the crime. *Id*. at 364.

The *Bryant* Court then turned to other factors that courts should consider when determining the primary purpose of an interrogation, such as the formality of the interrogation. *Id*. at 366. "Formality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution,

informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." *Id*. (quotation marks and citation omitted). That said, the Court emphasized that courts analyzing this issue should not brush aside the formality of an interrogation but should instead consider the totality of the circumstances surrounding the interrogation, including its formality, to determine the interrogation's primary purpose. *Id*.

*Bryant* stated that another factor courts could consider when determining an interrogation's primary purpose was "the statements and actions of both the declarant and interrogators." *Id*. at 367. "In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers," such as "if the police say to a victim, 'Tell us who did this to you so that we can arrest and prosecute them,' the victim's response that 'Rick did it' appears purely accusatory because by virtue of the phrasing of the question, the victim necessarily has prosecution in mind when she answers." *Id*. at 367-368.

With these factors in mind, the *Bryant* Court turned to the facts of the case before it and held that the primary purpose of the officers' interrogation of Covington was to enable police assistance to meet an ongoing emergency. *Id*. at 377-378. The Court observed that police arrived at the scene after receiving a call that a man had been shot, and they found Covington at the scene with gunshot wounds to his abdomen. *Id*. at 371. The officers asked Covington what happened, and while Covington identified who shot him, where he was shot, and a description of the shooter, Covington said little about the shooter's motive, and he did not say anything to suggest that "the shooting was a purely private dispute or that the threat from the shooter had ended." *Id*. at 372. On these facts, the Court concluded that "there was an ongoing emergency here where an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded Covington within a few blocks and a few minutes of the location where the police found Covington." *Id*. at 374. But the existence of an ongoing emergency, the Court emphasized, "is not the touchstone of the testimonial inquiry," and the question remained whether the primary purpose of the officers' interrogation of Covington was to address the ongoing emergency. *Id*. After viewing the interrogation from the responding officers' and Covington's perspectives, the Court concluded that it was clear that the officers were soliciting "the information necessary to enable them to meet an ongoing emergency," *id*. at 376 (quotation marks and citation omitted), and that Covington was not providing information "to establish or prove past events potentially relevant to later criminal prosecution," *id*. at 375 (quotation marks and citation omitted). Lastly, the Court observed that the interrogation was informal—it was unstructured, "fluid[,] and somewhat confused," as multiple officers arrived at different times, each asking Covington "what happened?" *Id*. at 376. This informality, the Court explained, suggested that "the interrogators' primary purpose was to address what they perceived to be an ongoing emergency," not to elicit statements from Covington to enable a future prosecution. *Id*. at 377. The Court held that all of this, taken together, established that Covington's statements were nontestimonial, so they did not implicate Bryant's rights under the Confrontation Clause. *Id*. at 377-378.

## C. APPLICATION

Turning to the case now before us, this case bears similarities to *Davis*, *Hammon*, and *Bryant*, but is also distinguishable from each case in significant ways. For instance, this case involves domestic violence like *Davis* and *Hammon*, but the perpetrator here, like the perpetrator in *Bryant*, possessed a gun and his location was unknown when the declarant spoke to the police.

But these similarities and dissimilarities are ultimately beside the point because, as *Bryant* teaches, determining the primary purpose of an interrogation is highly context dependent. See *id*. at 370.

We therefore turn to the context in which the declarant made her statements to Stover. As evidenced by Stover's bodycam footage, within one minute of beginning his interrogation of the declarant,[4] Stover learned that this was a case involving domestic violence between the declarant and defendant, and that the declarant's problems with defendant had persisted for some time. Shortly after learning this information, Stover took out a notepad and began asking the declarant background questions about herself, defendant, and their relationship. Stover then asked the declarant to describe what happened to her that night. Over roughly the next 10 minutes, the declarant told Stover what defendant allegedly did to her that night while Stover asked the declarant clarifying questions to better understand what defendant did. It was during this time that Stover said that dispatch mentioned a gun, and he asked the declarant whether defendant used a firearm to assault her, and if so, how. Stover then read his notes back to the declarant to ensure that he accurately recorded what she told him, and the declarant helped Stover fill in some gaps in his notes. Stover later took photos of the declarant to document her injuries, and his interrogation of the declarant ended after about 25 minutes.

On these facts, we think it obvious that the primary purpose of this interrogation was "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 US at 822. Stover's actions and statements—asking the declarant what defendant did to her that night, taking notes on the declarant's answers, asking the declarant clarifying questions to better understand what defendant did, reading his notes back to the declarant and having her fill in gaps in her story, and taking pictures to document the injuries she suffered—clearly show that Stover "was not seeking to determine . . . 'what is happening,' but rather 'what happened.' " *Davis*, 547 US at 830. And the declarant's responses—describing how defendant had assaulted her earlier that night—clearly show that she was giving answers "to establish or prove past events potentially relevant to later criminal prosecutions." *Id*. at 822. See also *Bryant*, 562 US at 375. Taken together, this suggests that, objectively viewed, the primary purpose "of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done." *Davis*, 547 US at 830.

This conclusion is buttressed by the formality of Stover's interrogation of the declarant. When declarant made her statements, she was in a safe location[5]—inside a residence away from

---

[4] Stover's interrogation of the declarant begins about one minute and thirty seconds into the bodycam footage.

[5] The prosecution contends on appeal that the declarant was not in a safe location because "law enforcement determined it was unsafe to send advocates to the residence to help [the declarant]." In support of this assertion, the prosecution cites to Stover's report "indicating CARE was not contacted because: '[a]ccused gone upon arrival and the victim is <u>not</u> in a safe location to send an advocate.' " The prosecution's argument is, at best, misleading. First, the prosecution does not fully quote what Stover's report said. The box on the form that Stover checked states, "CARE was not contacted because: [a]ccused gone upon arrival and the victim is <u>not</u> in a safe location to

defendant and "protected" by police, see *id*. at 831—and her "statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." *Id*. at 830. And the interrogation "took place some time after the events described were over." *Id*. "Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." *Id*.[6]

The trial court held that the declarant's statements were "nontestimonial because they were provided during an ongoing emergency." By holding that the existence of an ongoing emergency was conclusive of whether the declarant's statements were nontestimonial, the trial court committed a legal error. *Bryant* plainly states that, to determine whether statements made to police officers were nontestimonial, we look to the primary purpose of the interrogation, not to whether the statements were made during an ongoing emergency. See *Bryant*, 562 US at 366 (explaining that "whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation"). That aside, we disagree with the trial court's conclusion that there was an ongoing emergency.

The court reasoned that there was an ongoing emergency because defendant had just committed a violent crime against the declarant then fled to an unknown location while armed, and the fact that he could return at any moment meant that he posed an ongoing threat to the declarant and anyone she was with. While we agree that defendant posed an ongoing (hypothetical) threat to the declarant, he did not pose an *immediate* threat to her. See *Davis*, 547 US at 830-831 (contrasting how "there was no immediate threat to" Amy when she spoke to officers but McCottry was "in immediate danger from Davis" when she spoke to the 911 operator).

---

send an advocate (hospital, police station, shelter)." The locations in parentheses suggest that only these are considered "safe locations," which does not per se make everywhere else that is not a hospital, police station, or shelter "unsafe," at least as that term is colloquially used. Second, Stover checked a box on the same report indicating that CARE *was* contacted, but because of the late hour, Stover could only leave a voicemail for CARE staff. The checked box states, "CARE was contacted because: [b]etween 0100-0800, officer called [phone number] and left CARE staff a voicemail . . . ." We also note that our task is to objectively evaluate the facts, see *Bryant*, 562 US at 360, so even if Stover did believe that the declarant was in an unsafe location (which, again, is a claim that has no record support), his subjective assessment would not be controlling.

[6] We note that *Davis* explained that an officer's "initial inquiries"—that is, information an officer collects "to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim"—often "produce nontestimonial statements." *Davis*, 547 US at 832 (quotation marks and citation omitted). Here, it is not clear from the record what Stover knew about the situation he was walking into when he approached the residence to speak with the declarant, though we do know that dispatch told him that a firearm was involved in a possible crime. Without knowing more, we cannot say whether the declarant's answers to Stover's "initial inquiries" produced nontestimonial statements, but we recognize that it is possible. That said, the prosecution never sought to admit only the statements made by the declarant in response to Stover's "initial inquiries," so whether any of the declarant's initial statements to Stover were nontestimonial is not at issue, and we offer no opinion on the matter.

Rather, when the declarant spoke with Stover, she was inside a residence, removed from defendant, and protected by police. See *id.* at 831. And while it is also true that defendant was armed like the defendant in *Bryant*, defendant here, unlike the defendant in *Bryant*, was "a known and identified perpetrator" who was accused of domestic violence against the declarant. *Bryant*, 562 US at 363. Nothing about these facts, when viewed objectively, suggest that defendant posed a risk to public safety, even considering that defendant was armed. Indeed, the trial court did not reason that defendant posed a danger to public safety; it reasoned that defendant posed a risk to "the public" in the sense that he posed a hypothetical risk to anyone around the declarant. But, as *Bryant* counsels, it is simply not the case "that an emergency is ongoing in every place or even just surrounding the victim for the entire time that the perpetrator of a violent crime is on the loose." *Id.* at 365.[7]

## IV. CONCLUSION

For the reasons explained in this opinion, the declarant's statements to Stover were testimonial because the primary purpose of Stover's interrogation of the declarant was to establish or prove past events, and the declarant's statements were an obvious substitute for live testimony. The statements are thus subject to the Confrontation Clause. See *Crawford*, 541 US at 68; *Fackelman*, 489 Mich at 528.

Reversed.

/s/ Colleen A. O'Brien
/s/ Christopher M. Murray
/s/ Anica Letica

---

[7] The trial court stated that its conclusion would be different if more time had passed and things had "calmed down," but if, as the court reasoned, the fact that defendant was armed and posed a hypothetical threat to the declarant created an ongoing emergency, then it is not clear why the passage of time would make a difference. Defendant would presumably still have access to a firearm, and, until he was apprehended, he would continue to pose a hypothetical threat to the declarant.